# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**In re GALENA BIOPHARMA, INC.
SECURITIES LITIGATION**,

Case No. 3:14-cv-367-SI (LEAD)

**OPINION AND ORDER**

Jeffrey S. Ratliff, RANSOM GILBERTSON MARTIN & RATLIFF, LLP, 1500 N.E. Irving Street, Suite 412, Portland, OR 97232; Leigh R. Handelman Smollar and Patrick V. Dahlstrom, POMERANTZ LLP, Ten South La Salle Street, Suite 3505, Chicago, IL 60603; Jeremy A. Lieberman, POMERANTZ LLP, 600 Third Avenue, 20th Floor, New York, NY 10016; Laurence M. Rosen and Phillip Kim, THE ROSEN LAW FIRM, P.A. 275 Madison Avenue, 34th Floor, New York, NY 10016. Of Attorneys for Plaintiffs.

Kristen Tranetzki, ANGELI UNGAR LAW GROUP LLC, 121 S.W. Morrison Street, Suite 400, Portland, OR 97204; Jonathan R. Tuttle and Scott N. Auby, DEBEVOISE & PLIMPTON LLP, 555 13th Street N.W., Suite 1100E, Washington D.C., 20004. Of Attorneys for Defendant Mark J. Ahn.

Robert L. Aldisert, PERKINS COIE LLP, 1120 N.W. Couch Street, 10th Floor, Portland, OR 97209. Of Attorneys for Defendants Rudolph Nisi, Sanford Hillsberg, Steven Kriegsman, Stephen Galliker, and Richard Chin.

Lois O. Rosenbaum, STOEL RIVES LLP, 900 S.W. Fifth Avenue, Suite 2600, Portland, OR 97204; Paul R. Bessette, Michael J. Biles, and James P. Sullivan, KING & SPALDING LLP, 401 Congress Avenue, Suite 3200, Austin, TX 78701. Of Attorneys for Defendants Galena Biopharma, Inc., Ryan M. Dunlap, Remy Bernarda, and Mark Schwartz.

James T. McDermott and Ciaran P.A. Connelly, BALL JANIK LLP, 101 S.W. Main Street, Suite 1100, Portland, OR 97204; Jacob S. Frenkel, Russell D. Duncan, and Renee B. Kramer, SHULMAN, ROGERS, GANDAL, PORDY & ECKER, P.A., 12505 Park Potomac Avenue, Sixth Floor, Potomac MD 20854. Of Attorneys for Defendants Michael McCarthy and The DreamTeam Group, LLC.

Joseph C. Arellano and Daniel L. Keppler, KENNEDY WATTS ARELLANO LLP, 1211 S.W. Fifth Avenue, Suite 2850, Portland, OR 97204; Edward Gartenberg, GARTENBERG GELFAND HAYTON LLP, 801 S. Figureroa Street, Suite 2170, Los Angeles, CA 90017. Of Attorneys for Defendants Lidingo Holdings, LLC and Kamilla Bjorlin.

**Michael H. Simon, District Judge.**

This putative class action securities fraud case is brought by shareholders ("Plaintiffs") of Defendant Galena Biopharma, Inc. ("Galena" or "Company"). Plaintiffs allege that Galena, certain members of Galena's Board of Directors ("Board"), and executive officers of Galena engaged in a fraudulent scheme to promote Galena and increase its stock price so that many of Galena's officers and directors could (and did) sell their personally-owned Galena stock at artificially high prices, in a "pump and dump" insider trading scheme. Plaintiffs further allege that The DreamTeam Group LLC ("DreamTeam"), its Managing Member Michael McCarthy, its employee or agent Thomas Michael Meyer,[1] Lidingo Holdings, LLC ("Lidingo"), and Lidingo's Managing Member Kamilla Bjorlin,[2] participated in the scheme by publishing bullish articles, comments, blogs, posts, and email blasts, including having authors publish articles using false aliases, without including the required disclosure that they were being paid by Galena to try to inflate its stock price.[3]

---

[1] It does not appear that Meyer has been served in this action. Meyer has not yet appeared, and Plaintiffs have not filed any proof of service on Meyer. Meyer has not filed a motion to dismiss in this action. Accordingly, he is not included in the Court's references to "Defendants."

[2] Ms. Bjorlin was misidentified in the complaint as "Milla Bjorn."

[3] Section 17(b) of the Securities Act of 1933 provides: "It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof." 15 U.S.C. § 77q(b). This provision "'is particularly designed to meet the evils of the

Before the Court are five motions to dismiss: (1) a motion to dismiss filed by Defendants Rudolph Nisi, Sanford Hillsberg, Steven Kriegsman, Stephen Galliker, and Richard Chin (collectively "Outside Directors") (Dkt. 80); (2) a motion to dismiss filed by Defendant Mark J. Ahn (Dkt. 81); (3) a motion to dismiss filed by Defendants Mark Schwartz, Ryan Dunlap, and Remy Bernarda (collectively "Management Defendants") and Galena[4] (Dkt. 82); (4) a motion to dismiss filed by Defendants Lidingo and Bjorlin (collectively "Lidingo Defendants") (Dkt. 136); and (5) a motion to dismiss filed by Defendants DreamTeam and McCarthy (collectively "DreamTeam Defendants") (Dkt. 138). For the following reasons, the pending motions to dismiss are granted in part and denied in part.

## STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations

---

'tipster sheet' as well as articles in newspaper or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for.'" *U.S. v. Amick*, 439 F.2d 351, 365 (7th Cir. 1971) (quoting H.R. REP. No. 85, 73d Cong., 1st Sess. 24 (1933)).

[4] Ahn, the Outside Directors, the Lidingo Defendants, and the DreamTeam Defendants have joined and incorporated by reference Galena and the Management Defendants' motion, briefing, and arguments. Accordingly, those arguments are attributed to all defendants.

of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

## BACKGROUND[5]

### A.  Company Background

As alleged in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Consolidated Complaint" or "CAC"), Galena is a biotechnology company based in Lake Oswego, Oregon. In 2007 the Company was spun off from its parent, CytRx Corporation ("CytRx"). CytRx remained Galena's majority owner until 2008. In connection with the spin-off, Ahn was appointed a director of Galena. Ahn became Galena's President and Chief Executive Officer ("CEO") in March 2011.

---

[5] This section provides a summary of the conduct alleged by Plaintiffs, accepting as true all well-pleaded material facts. A more detailed discussion of Plaintiffs' specific allegations is included in the following section.

Galena focuses on the development and commercialization of targeted oncology treatments. Galena's only commercial-stage product is Abstral®, a propriety form of fentanyl, an opiate analgesic. Fentanyl can be abused and has been resold as a street drug. At least four other companies already offer generic fentanyl in the United States. As alleged by Plaintiffs, Galena is "far from obtaining financial success from selling Abstral." Galena also is pursuing the development of cancer therapeutics, including its main product candidate, NeuVax™, for the treatment of breast cancer.

**B.  Galena's Relationship with DreamTeam and Lidingo**

Galena's relationship with DreamTeam dates back to 2008, and its relationship with Lidingo dates back to 2012. Galena previously had hired these investor relations firms to tout Galena's stock in advance of stock offerings. In early summer 2013, Galena did not have any open contracts with either company.

In July 2013, Ahn asked Galena's Vice President of Marketing & Communications, Remy Bernarda, to interview three investor relations firms that could potentially increase Galena's stock price. Two of these companies were Tiberend Strategic Advisors ("Tiberend") and DreamTeam. Bernarda recommended that Galena hire Tiberend, a traditional, full service investor relations firm specializing in the healthcare and life sciences industry. Bernarda recommended that Galena not hire DreamTeam. Bernarda noted that Tiberend treated writers as "journalists," unlike DreamTeam. Bernarda further noted that if Galena hired DreamTeam, she believed it would cause "issues." Galena hired Tiberend at $3,500 per month for an initial three-month trial.

Despite Bernarda's recommendation to the contrary, Ahn also hired DreamTeam. DreamTeam began its work under a 90-day, $25,000 contract for "Platinum Services" dated

July 23, 2013 and a 240-day, $50,000 contract also dated in July 2013. The total monthly

payment to DreamTeam was approximately $14,583.

    In addition, Ahn signed a contract with Lidingo on August 1, 2013, which obliged Galena

to pay Lidingo a cash fee of $20,000 per month plus expenses. The contract also gave Lidingo an

option to buy 250,000 shares of Galena common stock at an exercise price based on the day the

agreement closed, 100,000 shares of which vested immediately. Plaintiffs allege that Ahn did not

have the corporate authority to award stock options.

## C. Alleged Scheme

    Plaintiffs allege that Galena and its management and directors entered into an unlawful

promotional scheme with DreamTeam and Lidingo artificially to inflate the stock price of

Galena using a variety of different channels. Galena intended that DreamTeam and Lidingo

would place misleading articles on investor websites touting Galena. DreamTeam and Lidingo

did so, often using third parties and aliases that falsely claimed to be established, credible

investment professionals. The articles did not disclose the paid relationship with Galena and

often included false disclaimers that they were not paid promotions. Galena required that it

approve every article before that article could be published, and either Ahn or Bernarda approved

each article.

    By way of example, on or about August 6, 2013, DreamTeam submitted to the online

investment advice website *Seeking Alpha*[6] an article entitled "Galena Biopharma Presents an

---

[6] As alleged by Plaintiffs, *Seeking Alpha* is the leading website used by analysts and
professional and institutional investors to publish independent analyses related to investment.
Researchers have found a relationship between negative articles on *Seeking Alpha* and
subsequent low stock prices. Using negativity on *Seeking Alpha* as an index outperformed
broader market indices. Galena, knowing the importance of *Seeking Alpha*, filed a lawsuit
in September 2013 over comments made in an article published on *Seeking Alpha*, noting in the suit
that *Seeking Alpha* is a "leading website" that is "extremely influential" and is "relied on by
market analysts, and viewed by millions of investors worldwide." In addition to *Seeking Alpha*,

Attractive Investment Opportunity." This article recommended investment in Galena stock, but failed to disclose any financial relationship between the author, who was identified only as "Wonderful Wizard," and either Galena or DreamTeam. The article affirmatively misrepresented that it was not a paid promotion.

Another article placed by DreamTeam touting Galena in *Seeking Alpha* appeared on November 22, 2013, this time by an author identified only as "Kingmaker," who also failed to disclose any relationship with either Galena or DreamTeam. These two articles about Galena in *Seeking Alpha* were presented as being written by two different people, each recommending investment in Galena, but were allegedly actually written by the same author.[7] As of November 26, 2013, DreamTeam had caused to be published 18 articles about Galena on *Seeking Alpha*.

DreamTeam and Lidingo would also monitor social media, post on electronic message boards and blogs, and send email blasts relating to Galena. They used numerous aliases on Facebook, twitter, and other social networking sites to call attention to the positive (and allegedly misleading) articles and to respond to any negative articles or comments about Galena. By way of example, Plaintiffs allege that hours after Galena and DreamTeam caused to be published a pro-Galena article on August 6, 2013, two aliases posted on a Yahoo! Finance Galena page that the article was "worth checking out." One of these posts indicated that the person posting would buy more Galena stock the next day. Similarly, on November 27, 2013, Galena and DreamTeam

---

DreamTeam and Lidingo targeted other key investment websites and publications, including *Forbes.com*, *Wall Street Cheat Sheet*, *TheStreet.com*, and *Motley Fool*.

[7] Ultimately, the website *Seeking Alpha* removed from its website the August 6, 2013 article by "Wonderful Wizard" and the November 22, 2013 article by "Kingmaker." *Seeking Alpha*'s Vice President of Content and Editor-in-Chief, Eli Hoffman, explained that the removal of the articles was done because they violated *Seeking Alpha*'s terms of use when the author failed to disclose to *Seeking Alpha* that "Kingmaker" and "Wonderful Wizard" were, in fact, the same person.

caused another article to be published on the website *Seeking Alpha* using the alias "Stock Whisper" and then posted on DreamTeam's blog, stating that "Stock Whisper" had published a bullish article about Galena. The post on DreamTeam's blog summarized and analyzed the *Seeking Alpha* article without disclosing that DreamTeam or its agents had, in fact, authored both. Some of the articles published resulted in Galena's stock price gaining fifteen percent in a single day.[8]

Many different fraudulent aliases and third parties were used by DreamTeam and Lidingo to convince investors that there was a broad base of independent and professional investors supporting Galena. The fact that many different "voices" appeared to be touting Galena persuaded investors that the conclusions must be accurate and that there was heavy demand for Galena's stock.

Shortly after retaining Lidingo and DreamTeam in July 2013, Galena initiated a secondary offering.[9] It filed an amended registration statement with the Securities Exchange

---

[8] Plaintiffs allege that on the day that seven of the allegedly misleadingly articles were published, there were gains in Galena's stock price ranging from seven to fifteen percent. Plaintiffs further allege that there was no other Galena-specific news on those days, other than the allegedly false or misleading articles posted as part of the alleged promotional scheme.

[9] In modern parlance, the term "secondary offering" has two meanings: (1) "[a]n offering of previously issued securities by persons other than the issuer"; and (2) "[a]ny offering by an issuer of securities after its initial public offering." BLACK'S LAW DICTIONARY, 1190 (9th Ed. 2009); *see also In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1106-07 (9th Cir. 2013) (using the term "secondary offering" in connection with an issuance of shares by the issuing company); *Jennings v. Gen. Med. Corp.*, 604 F.2d 1300, 1303 n.4 (10th Cir. 1979) (noting that a secondary offering is where shareholders of a corporation sell stocks that they own in the corporation and take the proceeds of the sale, as compared to a primary offering where the company sells stocks and takes the proceeds for the company). In the former, the proceeds of the sale go to the selling shareholders. In the latter, the proceeds of the sale go to the issuing company. Because Plaintiffs allege that "Galena sold" shares in the secondary offering and that there were "net proceeds to Galena" through the secondary offering, it appears that Plaintiffs are alleging a "secondary offering" under the second definition. This point should be clarified in any further amended complaint.

PAGE 8 – OPINION AND ORDER

Commission ("SEC") on August 9, 2013. On September 18, 2013, Galena conducted a public offering, selling 17,500,000 units, each consisting of one share of common stock and a warrant to purchase 0.35 of a share of common stock at an exercise price of $2.50 per share, for net proceeds to Galena of $32.6 million. Galena raised additional net proceeds of $5.2 million through the underwriters' exercise of their over-allotment option.

Plaintiffs further allege that Galena, DreamTeam, Lidingo, and their respective management personnel entered into this scheme with the plan to manipulate Galena's stock price. Galena's officers and directors intended to wait until the share price of Galena was artificially inflated as a result of DreamTeam and Lidingo's misleading promotional campaign and then, in possession of material, adverse, non-public information, sell their personally-held stock.

On November 22, 2013, the same day that the *Seeking Alpha* bullish article was published, Galena's Compensation Committee[10] granted a total of 2.55 million shares of stock options to Galena's officers and directors. These options issued in November carried an exercise price of $3.88 per share. This was the only time that options had been awarded by the Compensation Committee at that time of year.[11] The usual practice by the Compensation Committee had been to grant stock options to Galena's officers and directors in January of any given year.

By early January 2014, Galena's stock price had risen significantly. In July 2013, it traded at approximately $2 per share. By January 16, 2014, it had more than tripled and was

---

[10] The Compensation Committee consisted of Defendants Richard Chin, Steven Kriegsman, and Ryan Dunlap.

[11] Although these stock options were granted in November 2013, they vested over a period of three years, in twelve equal quarterly installments.

trading at $7.48 per share. Beginning January 17, 2014, and within a period of eighteen trading days, through February 12, 2014, six of Galena's officers and directors sold all or nearly all of their personally-held Galena stock; a seventh sold approximately 20 percent of his shares. Collectively, these sales totaled more than $16 million.[12] The Consolidated Complaint alleges that these were all direct sales and not made pursuant to any pre-arranged Rule 10b5-1 trading plan. Plaintiffs further allege that none of these defendants had engaged in open market sales of Galena stock during the four years before January 2014.

**D.  Exposing the Alleged Scheme**

The scheme allegedly began to unravel as news of the insider trades entered the market. Plaintiffs allege that from January 17, 2014 through January 31, 2014, based on news of the insider trades, Galena's stock price fell approximately 29.5 percent, from $7.48 to $5.27. On February 1, 2014, analyst Matt Gravitt published an article on *Seeking Alpha*, titled "Galena Biopharma: Numerous Red Flags Suggest a Significant Overvaluation." This article revealed that Galena had been paying MissionIR, a DreamTeam brand, to promote Galena. Galena's stock price fell an additional 20 percent, from $5.27 to $4.22.

On February 12, 2014, journalist Adam Feuerstein published an online article on *TheStreet.com*, titled "Galena Biopharma Pays for Stock-Touting Campaign While Insiders Cash Out Millions." In his article, Mr. Feuerstein alleged that Galena was engaging in a misleading brand-awareness campaign aimed at boosting its stock price. The article also reported that Galena had paid DreamTeam to publish articles promoting the Company's stock without disclosing who paid for those articles. On this news, Galena's stock dropped from $5.22 to

---

[12] After the alleged scheme was disclosed to the public, Galena's stock price reverted back to approximately $2 per share.

$4.26, a one-day decline of approximately 16 percent. None of the Selling Defendants[13] sold any personally-held stock after February 12, 2014. Plaintiffs allege that within hours of this article's publication, Galena fired DreamTeam. Plaintiffs further allege that DreamTeam then attempted to remove evidence of its relationship with Galena by deleting a disclaimer DreamTeam had posted on its website noting that Galena had paid MissionIR for promotional services and removing almost all articles related to either Galena or CytRx from DreamTeam's websites.

Two days later, on February 14, 2014, an analyst published an article on *Seeking Alpha*, attributing Galena's stock price performance since November 2013 to DreamTeam's promotional efforts. That same day, Galena published an open letter to its investors. The letter admitted that the Company had paid DreamTeam to promote Galena's stock and that Company insiders had sold, or "divested," personally-owned shares in mid-January 2014, but denied all other allegations. On that same day, February 14, 2014, Galena's stock price dropped $0.63 per share to close at $3.73 per share, a one-day decline of 14 percent.

On March 13, 2014, financial analyst and author Richard Pearson published the results of his investigation of the relationship between Galena, CytRx, and DreamTeam on *Seeking Alpha*. The article detailed Mr. Pearson's findings after going "undercover" as a writer for DreamTeam assigned to promote Galena. Mr. Pearson also released his emails with Meyer, who claimed to be an employee of DreamTeam working closely with McCarthy. Mr. Pearson's investigative article stated that he was told that DreamTeam's clients would have to approve and edit all articles and that Mr. Pearson was not allowed to disclose that he was being paid to write the pro-Galena articles.

---

[13] The "Selling Defendants" are Ahn, Kriegsman, Chin, Nisi, Hillsberg, Galliker, and Schwartz.

On March 17, 2014, two trading-days after the publication of the Pearson exposé, Galena announced that it was under investigation by the SEC, stating in its Form 10-K annual report: "In February 2014, we learned that the SEC is investigating certain matters relating to our company and an outside investor-relations firm that we retained in 2013. We have been in contact with the SEC staff through our counsel and are cooperating with the investigation." Upon disclosure of the SEC investigation, Galena's common stock share price dropped to $2.82, representing a 12 percent single day loss.

On August 18, 2014, Galena's Board held a special meeting. On August 20, 2014, Mr. Feuerstein announced that a source close to Galena had informed him that Ahn had been fired for cause at that special meeting. As alleged by Plaintiffs, at the time of Mr. Feuerstein's report, neither Galena nor anyone else had announced that Ahn had left the company.

On August 21, 2014, Galena issued a press release claiming that Ahn had "resigned" as President and CEO. On August 22, Galena filed a report with the SEC. This report stated that Ahn had "resigned" effective August 20, 2014. This report also stated that "[i]n accordance with the terms his employment agreement . . . no severance or other compensation is payable to Dr. Ahn."

On August 21, 2014, Galena also issued a press release that stated Ahn had resigned "to pursue other long held personal and professional goals." Plaintiffs' allege, however, that Ahn's employment agreement, dated March 31, 2011, provides that Ahn will receive severance unless he was fired for cause or resigned without good reason.

**E.  Galena's Additional Alleged Misrepresentations**

In addition to the alleged scheme and the alleged misrepresentations made through the promotional campaign, Plaintiffs allege that Galena made false or misleading statements in its own name. To conduct its September 2013 public offering, on September 13, 2013, Galena

entered into an Underwriting Agreement, signed by Ahn. This Underwriting Agreement was filed as an exhibit to Galena's 8-K filing with the SEC made that same day. Plaintiffs allege this Underwriting Agreement was false or misleading because it claimed that Galena was not engaging in any conduct that would "manipulate" its stock price.

The same day, also as part of its secondary offering, Galena published a Prospectus. Plaintiffs allege that this Prospectus is misleading and contains material omissions because it lists several possible reasons why Galena's stock price might fluctuate, but does not disclose the alleged promotional scheme as one of those reasons.

On November 6, 2013, Galena filed a Form 10-Q with the SEC, signed by Ahn and Vice President and Chief Financial Officer Ryan Dunlap. Plaintiffs allege this form is false or misleading because it asserts that no material facts are omitted from the report and that the signatories have disclosed to Galena's auditors any fraud that involves Galena's management or other employees. Plaintiffs also allege that Galena's Code of Ethics is false or misleading because it is publicly available and states that Galena will not tolerate conduct that risks a violation of federal law.

## DISCUSSION

### A.  Jurisdiction over DreamTeam Defendants

The DreamTeam Defendants originally argued that the Court does not have personal jurisdiction over either DreamTeam or McCarthy. Plaintiffs responded that, pursuant to the Ninth Circuit's holding in *Sec. Investor Prot. Corp. v. Vigman*, 764 F.2d 1309, 1316 (9th Cir. 1985), the Securities Exchange Act of 1934 (the "Exchange Act") authorizes nationwide service and the only requirements for personal jurisdiction are that the defendant have minimum contacts with the United States. In their reply brief, the DreamTeam Defendants concede that the Court has

personal jurisdiction over DreamTeam and McCarthy. Accordingly, DreamTeam's motion under Federal Rule of Civil Procedure 12(b)(2) is denied.[14]

## B.  Securities Fraud Pleading Standards

To state a claim for securities fraud a plaintiff must prove:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Halliburton Co. v. Erica P. John Fund, Inc.*, --- U.S. ---, 134 S. Ct. 2398, 2407 (2014) (quotation marks omitted). A complaint alleging securities fraud in a private action for damages is also subject to heightened pleading standards.

First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "To satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'" *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)).

---

[14] The DreamTeam Defendants continue to argue in their reply brief that McCarthy cannot be held personally liable unless Plaintiffs plead facts sufficient to "pierce the corporate veil." The argument that McCarthy cannot be personally liable based on his status as the managing member of DreamTeam was raised in the context of the DreamTeam Defendants' personal jurisdiction motion. The Court considered this argument in evaluating whether Plaintiff sufficiently states a claim for relief against McCarthy. Although not considered in the state law context of piercing the corporate veil, Plaintiffs' specific allegations against McCarthy as an individual are evaluated to determine only if they are sufficient to meet the heightened pleading requirements in a securities fraud case.

Second, because Plaintiffs allege misrepresentations in violation of Section 10(b) of the Exchange Act, *codified at* 15 U.S.C. § 78j ("Section 10(b)"), and Rule 10b-5(b), that claim must satisfy the requirements of the Private Securities Litigation Reform Act ("PSLRA"), *codified at* 15 U.S.C. § 78u-4(b). The PSLRA requires a plaintiff plead with particularity each statement or omission that is alleged to be misleading and the reasons why it is misleading. 15 U.S.C. § 78u-4(b)(1). The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference" that the defendant acted with scienter. *Id.* § 78u-4(b)(2). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,' but it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 324 (2007).

"Scienter may be established . . . by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their statements." *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). Recklessness in this context is "'deliberate recklessness' or 'conscious recklessness,' and . . . it includes 'a subjective inquiry' turning on 'the defendant's actual state of mind.'" *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (quoting *Gebhart*, 595 F.3d at 1042)). The Ninth Circuit has defined the required deliberate or conscious recklessness in the context of a securities fraud case as:

> a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. [Additionally,] the danger of misleading buyers must be actually

known or so obvious that any reasonable man would be legally
bound as knowing.

*In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1053 (9th Cir. 2014) (quotation marks and

citation omitted) (first alteration in original).

## C.  Scienter

Defendants argue that Plaintiffs do not plead sufficient facts showing that any of them

knew or were sufficiently reckless to the truth about the alleged fraud or scheme. Scienter is a

necessary element for Plaintiffs' claim under Section 10(b) and Rule 10b-5 (alleged against

Galena, Ahn, Dunlap, Bernarda, the DreamTeam Defendants, and the Lidingo Defendants) and

claims of insider trading (alleged against Defendants Ahn, Kriegsman, Chin, Nisi, Hillsberg,

Galliker, and Schwartz). In evaluating scienter, courts must look at the complaint in its totality

and not just the individual allegations of scienter. *See Zucco Partners, LLC v. Digimarc*

*Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) ("Thus, a court now reviewing a complaint's scienter

allegations under the PSLRA must 'consider the complaint in its entirety, as well as other

sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular,

documents incorporated into the complaint by reference, and matters of which a court may take

judicial notice.' The court must determine whether '*all* of the facts alleged, taken collectively,

give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in

isolation, meets that standard.'" (emphasis in original) (quoting *Tellabs*, 551 U.S. at 322-23)

(citation omitted)); *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("[A]

court should look to the complaint as a whole, not to each individual scienter allegation as

*Silicon Graphics* suggests. Thus, *Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.").[15]

### a. Ahn

Defendants argue that Plaintiffs do not sufficiently allege Ahn's scienter because there are no facts alleged showing that Ahn knew that writers were being paid to tout Galena, knew the writers were using multiple aliases, or knew the articles were not disclosing the paid relationship. Defendants also argue that a more reasonable inference is that Ahn was merely reviewing draft articles to "fact-check" for inaccuracies concerning Galena's business.

Viewing the Consolidated Complaint as a whole, the Court finds that it sufficiently alleges facts giving rise to a strong inference of Ahn's scienter. Plaintiffs assert numerous allegations relevant to Ahn's scienter.[16]

With respect to the alleged promotional scheme, Plaintiffs allege that Ahn: (1) corresponded extensively with DreamTeam and Lidingo; (2) overruled Bernarda's objection and hired DreamTeam in July 2013; (3) signed the contract between Lidingo and Galena, committing to pay Lidingo $20,000 per month when the "legitimate" public relations firm hired

---

[15] The Court notes that much of the Consolidated Complaint impermissibly lumps all Defendants together in alleging that "Defendants" performed some act or knew about some fact. That is improper. *See Swartz v. KPMG* LLP, 476 F.3d 756, 764-65 (9th Cir. 2007) ("Rule 9(b) does not does not allow a complaint to merely lump multiple defendants together but 'require[s] plaintiffs to differentiate their allegations when suing more than one defendant . . . and inform each defendant separately of the allegations surrounding his [or her] alleged participation in the fraud.'" (alterations in original) (citation omitted)). In evaluating the sufficiency of Plaintiffs' allegations under the PSLRA and Rule 9(b), the Court considers the allegations and incorporated documents specific to each defendant and not the impermissible allegations attributing something to all Defendants as a single unit. If Plaintiffs file another amended complaint, they shall correct this error and replead specifically against the appropriate Defendant or Defendants the allegations currently alleged against all "Defendants" or against a "group" of Defendants.

[16] *See* CAC ¶¶ 7, 10, 24, 26, 73, 75, 77, 84, 85, 89-95, 97-100, 127-31, 147, 156, 165-66, 174-76, 179, 180, 183-87, 189, 193-97, 217.

by Galena (Tiberend) was paid only $3,500 per month; (4) lied to certain Galena managers and claimed he had not renewed Lidingo's contract; (5) awarded Lidingo Galena stock options, despite the fact that Ahn did not have the authority to grant such options; (6) actively concealed from Galena's Board and Compensation Committee the fact that Ahn had improperly granted Galena stock options to Lidingo; (7) knew that the Lidingo contract required Galena to cover Lidingo's expenses, which included payments to writers; (8) signed a check to Lidingo in April 2012 to pay writers; (9) signed the contract between DreamTeam and Galena, committing to pay DreamTeam $25,000 per month for three months and then $50,000 total for approximately eight months; (10) reviewed draft articles from Lidingo and DreamTeam; (11)  approved the articles before they could be published; (12) requested and received copies of published articles after publication; (13) knew the articles were part of the paid promotion; (14) knew that the articles did not contain the required disclosure that the authors were paid, having received copies of the completed articles; and (15) lied about why Galena terminated DreamTeam and the quantity and quality of the relationship between Galena and DreamTeam.

Plaintiffs also allege that Ahn knew and allowed insiders to sell stock during the height of the promotion scheme in violation of Galena's insider trading policy and conspired with Dunlap to "confuse" the market and hide the insiders' sell-off. To do so, Dunlap and Ahn encouraged the inside sellers to also make numerous "small buys" so that the insider selling SEC Form 4's would be mixed with insider buying forms.

Plaintiffs further allege that Ahn sold a significant amount of personally-held Galena stock in a manner inconsistent with his historical trading practices and after the stock had increased in price. He then publicly asserted a false reason for his insider sales, falsely stating

that he was precluded from selling Galena stock for nine months that ended in January 2014, when in fact the "blackout" continued until March 2014.

On January 16, 2014, Galena's stock hit its highest price since 2010. Plaintiffs allege that Galena held a Board meeting that same day. At that time, Galena was in a trading "blackout" for insiders. This insider trading "blackout" was in place because Galena insiders had received Galena's preliminary earnings report and thus could not trade until the final earnings report was publicly disclosed. The minutes from the January 16, 2014 Board meeting reflect that after discussion, the Board lifted the trading blackout. The testimony of the Board members to Galena's Special Committee investigating the alleged wrongdoing, however, was "inconsistent" with there being such a discussion and vote that day during the Board meeting. The Special Committee concluded in its report[17] that if the vote had occurred, it appeared solely designed to allow insiders to immediately sell their Galena stock.

Plaintiffs also allege that Galena's Special Committee determined that Ahn had violated company policy, may have breached his fiduciary duties, likely violated securities laws, and lied to the Special Committee. Ahn was then terminated for cause after his misconduct came to light, although he falsely claimed that he resigned.

---

[17] The Consolidated Complaint expressly references the Report to the Board of Directors of Galena Biopharma, Inc. Regarding the 2012-2014 Market Visibility Campaigns and the Sales By Insiders in the First Quarter of 2014, dated July 15, 2014 ("Special Committee Report"). Thus, the Court may consider the Special Committee Report in full, including all of its attached exhibits, without converting the pending motions to Rule 56 motions. *See Tellabs*, 551 U.S. at 322 (a court may consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"); *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003) (court may "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."); *Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir. 1997) ("Thus, for example, a court ruling on a motion to dismiss may consider the full texts of documents which the complaint quotes only in part.").

Plaintiffs also incorporate by reference emails to DreamTeam in which Ahn requests that he be sent copies of published articles. Plaintiffs further allege that either Ahn or Bernarda, both of whom were copied on the emails attaching draft articles, approved all of the articles drafted by DreamTeam before those articles could be published. Plaintiffs also allege that DreamTeam stated in an email to Mr. Pearson that Galena was slow to approve articles and that DreamTeam "can't make [Galena] approve when I say, it's up to them unfortunately." CAC ¶ 148.

These numerous particularized factual allegations relating to Ahn's knowledge and conduct support a strong inference that Ahn knew or was, at a minimum, deliberately or consciously reckless as to the truth or falsity of the fact that Lidingo and DreamTeam were using illegitimate means to boost Galena's stock price and that the promotional campaign violated the securities laws. Although the Consolidated Complaint does not identify specifically which articles were approved by Ahn and specifically which were approved by Bernarda, the email exhibits to the Special Committee Report, incorporated by reference, show that the articles were sent to both Ahn and Bernarda at the same time and knowledge of their contents can be imputed to both of them, regardless of who made the specific approval on any given article. Ahn approved drafts that did not contain the required paid promotion disclaimer and was later provided copies of final, published versions that also did not contain the required paid promotion disclaimer.

Additionally, Ahn's alleged attempts to hide that he renewed Lidingo's contract and awarded stock options to Lidingo and his responses and attempts to cover up the specifics of the paid promotional campaign and his personal sale of stock also support a strong inference of scienter. *See, e.g.*, *Nathanson v. Polycom, Inc.*, --- F. Supp. 3d ----, 2015 WL 1517777, at *9 (N.D. Cal. 2015) (noting that the defendant CEO's attempts to hide his conduct was evidence of

scienter); *In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up [sic] a misdeed is strong proof of scienter."). Plaintiffs' allegations also show that Ahn was involved in the attempted cover-up of Galena's relationship with DreamTeam and Lidingo, further supporting Ahn's scienter. Immediately after the alleged promotional scheme came to light, Ahn terminated DreamTeam and then publicly stated he terminated DreamTeam for "performance reasons." Ahn also terminated Lidingo. DreamTeam then attempted to remove all evidence of its connection with Galena, and Ahn was one of Galena's primary contact persons for DreamTeam and was Galena's CEO. Thus, it is a reasonable inference that Ahn was aware of this alleged cover-up. Ahn also allegedly lied to a reporter, stating that Galena did not approve any of the articles drafted by DreamTeam writers and that Ahn was not aware that the *Seeking Alpha* articles were the result of the DreamTeam campaign, even though emails sent to Ahn show otherwise.

Further, the fact that Ahn was terminated for cause, or even if he resigned (as stated by Ahn), after the conduct came to light is evidence supporting an inference of scienter. *See Cement & Concrete Worker's Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1138 (N.D. Cal. 2013) (noting that the fact that a defendant resigns after alleged misconduct is revealed "provides minimal, non-dispositive supporting evidence of scienter" (quotation marks omitted)).

Finally, Ahn's insider stock sales support a strong inference of scienter. *See Tellabs*, 551 U.S. at 325 (noting that "personal financial gain may weigh heavily in favor of a scienter inference"). "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco Partners*, 552 F.3d at 1005 (quotation marks omitted). Three factors that

courts should consider "to determine whether stock sales raise a strong inference of deliberate

recklessness are: '(1) the amount and percentage of shares sold by insiders; (2) the timing of the

sales; and (3) whether the sales were consistent with the insider's prior trading history.'" *Id.*

(quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

   Here, Plaintiffs have alleged facts sufficient to show that Ahn's stock sales support a

strong inference of scienter. On January 27, 2014, Ahn sold approximately 87 percent[18] of his

personal holdings of Galena stock and received proceeds of approximately $3.8 million. These

sales were not made pursuant to a pre-arranged Rule 10b5-1 trading plan, and Ahn had not sold

any Galena stock on the open market in the previous four years. Ahn thus received millions of

dollars selling the large majority of his personal Galena shares in a sale that was dramatically out

of line with his prior trading practices. Further, the sales were timed to maximize the price

increase that had resulted from the paid promotional campaign, which was material, nonpublic

information. Galena's stock price had been increasing for months, but had just started to decrease

after other insiders began selling large amounts of their personal stock. Although Ahn, unlike

some of the other Defendants, missed selling at what turned out to be the highest price

(approximately $7), he still sold while the promotional campaign was ongoing and undisclosed

and the price was allegedly still inflated (approximately $5).

   Ahn argues that the more compelling inference to be drawn from the facts alleged in the

Consolidated Complaint is that he hired multiple investor and public relations firms, he had no

reason to believe those firms were paying authors and not disclosing that fact, he reviewed

---

[18] Ahn notes that although he sold 87 percent of his personally-held stock, he also held exercisable options that he could have sold and so the percentage sold of his total vested beneficial interest was only 67 percent. Even assuming Ahn's calculations are correct and Plaintiffs' allegation that Ahn sold 87 percent of personally-held stock overstates Ahn's sale, this fact does not materially alter the Court's analysis.

articles to ensure their factual accuracy regarding Galena's business, and he sold his stock to diversify his investment portfolio. The Court finds that the inference of scienter alleged by Plaintiffs are "as cogent or compelling as a plausible alternative inference" and, thus, that Ahn's scienter has been adequately alleged. *See Zucco Partners*, 552 F.3d at 1007.

### b. Bernarda

Similar to the allegations made against Ahn, Plaintiffs allege that Bernarda corresponded extensively with DreamTeam and Lidingo; reviewed, edited, and approved the articles; knew that the articles were part of the paid promotional scheme; admitted to the Special Committee that she knew the articles were part of the paid promotional campaign; received copies of the published articles; and knew the articles did not disclose their paid connection to Galena.[19]

Plaintiffs also allege that either Ahn or Bernarda, both of whom were copied on the emails attaching draft articles, approved certain articles drafted by DreamTeam before those articles could be published. As with the allegations against Ahn, the fact that the Consolidated Complaint does not identify which articles were approved by Ahn and which were approved by Bernarda is not fatal because the email exhibits show that articles were sent to both Ahn and Bernarda at the same time and knowledge of the articles can be imputed to both of them.

Unique to Bernarda, Plaintiffs allege that on December 12, 2013, Tiberend, the "legitimate" public relations firm retained by Galena, warned Bernarda that hiring an investment relations firm that engages in "pay-for-play" often "border[s] on fraud." CAC ¶ 177. Tiberend cautioned that these firms "are asking for fees but not disclosing that the resulting article was paid for by the company. They generally hide this connection (you pay CSIR Group; they pay a blogger), but I think this will eventually get noticed by regulators and trouble could ensue." *Id*.

---

[19] *See* CAC ¶¶ 7, 24, 26, 84, 85, 180, 185, 217.

On December 16, 2013, Tiberend forwarded such an article, written by Defendant

Thomas Meyer, to Bernarda. Bernarda claimed that she did not know Meyer, even though she

had approved an article written by Meyer two weeks earlier, on December 3, 2013. Additionally,

as alleged by Plaintiffs, either Bernarda or Ahn had approved the very article forwarded by

Tiberend. Further, as discussed above, Bernarda had originally warned Ahn about the potential

regulatory scrutiny that may arise from hiring DreamTeam. Bernarda stated that she wanted to

hire Tiberend, who "treats all authors like 'journalists.'" These allegations support an inference

that Bernarda knew that DreamTeam's promotional campaign was improper.

Plaintiffs also allege that on November 26, 2013, DreamTeam sent to Bernarda a list of

all the articles it had published on *Seeking Alpha*, including 18 articles with a link to each article.

Each of those articles was subject to the *Seeking Alpha* disclaimer that it was not a paid article.

Moreover, this email contained the alias of the purported authors with links to their allegedly

fraudulent profile pages, which did not disclose the author's affiliation with DreamTeam.

Plaintiffs' allegations are sufficient to support a strong inference of scienter that Bernarda

knew or was reckless with the truth about the fact that DreamTeam was paying for promotional

articles and other materials to be published without disclosing those promotional materials had

been paid for by Galena. As alleged by Plaintiffs, Bernarda approved draft articles that did not

contain the required paid promotion disclaimer and received copies of published articles that did

not contain the required paid promotion disclaimer. She knew these articles were part of a paid

promotion. She knew or suspected DreamTeam's campaign was improper. She also falsely

denied knowing Meyer when Tiberend forwarded her the article he had written.

Plaintiffs do not, however, allege with particularity Bernarda's scienter with regard to

Lidingo during the relevant time period. The only allegations regarding Bernarda's knowledge of

Lidingo's relationship with Galena during the relevant time period are general, conclusory allegations that do not contain the required level of particularity. The specific allegations, including those incorporating by reference the Special Committee Report and its exhibits, relate to Galena's relationship with Lidingo before the relevant time period. Unlike with Ahn, Plaintiffs offer no particularized allegation that Bernarda knew Galena had an ongoing promotional relationship with Lidingo during the relevant time period. To the contrary, Plaintiffs allege that Bernarda stated that she was told by Ahn that he had not renewed Lidingo's contract. Thus, Plaintiffs have not sufficiently pled Bernarda's scienter for Plaintiffs' claims involving Lidingo's promotional activities.

### c.  Dunlap

The allegations specific to Dunlap in the Consolidated Complaint are that he: (1) signed some of Galena's SEC filings, which were allegedly false or misleading; (2) drafted a new insider trading policy in August 2013, shortly after the alleged promotional scheme began, that was less restrictive than the old policy; (3) advised Kriegsman in December 2013 that he should not be selling shares but was aware that Kriegsman intended to sell shares anyway; (4) orchestrated the plan to make numerous small buys to disguise the large insider sales; (5) was included on emails from Lidingo during the relevant time period attaching published articles; (6) was included on emails from Lidingo and Ahn in November 2013 relating to the stock options awarded to Lidingo and the renewed contract with Lindigo; (7) conspired with Ahn to conceal the fact that Ahn had improperly awarded stock options to Lidingo; (8) failed to disclose to the Compensation Committee or Board his knowledge that Ahn had given stock options to Lidingo even though he attended those meetings in November 2013 and January 2014,

respectively; and (9) informed Galena insiders in December 2013 that they could not sell Galena stock until March 2014.[20] Plaintiffs do not allege that Dunlap sold any of his Galena stock.

Considering the Consolidated Complaint as a whole, these factual allegations are not sufficient to show that Dunlap knew or was reckless with the truth about the fact that DreamTeam and Lidingo were causing promotional materials to be published without disclosing that Galena paid them to do so. Although the allegations are sufficient to show that Dunlap knew that Galena was in a promotional relationship with Lidingo and that Ahn had improperly awarded stock options to Lidingo, there are no particularized allegations that Dunlap knew that Lidingo was causing promotional publications to be published in a misleading fashion or without the required disclosures. Additionally, although the allegations are sufficient to show that Dunlap knew directors were selling their stock in violation of Galena's blackout period, there are no particularized allegations that Dunlap knew or believed these sales were to take advantage of the alleged illicit promotional scheme. The trading blackout period instituted by Dunlap was because of the insiders' knowledge of Galena's earnings report, not the promotional campaign.

### d.  Kriegsman

Kriegsman has served on Galena's Board since 2006. He is the chairman of Galena's Compensation Committee. He is one of the first Galena insiders to sell any shares. He sold 200,000 shares, approximately 32 percent of his holdings, on January 17, 2014. He sold another 250,000 shares three trading days later, on January 22, 2014, representing approximately 59.5 percent of his then-remaining Galena shares. The next day, January 23, 2014, he sold another 150,000, representing approximately 88 percent of his then-remaining shares. In

---

[20] *See* CAC ¶¶ 109-11, 119-25, 131, 166, 175-76, 233-35.

total, within the span of five trading days, Kriegsman sold approximately 97 percent of his personally-held Galena stock.

As discussed above, suspicious sales by insiders "weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325; *see also Zucco*, 552 F.3d at 1005. Evaluating whether sales are suspicious requires considering the amount and percentage of shares sold, the timing of the sales, and whether the sales are consistent with the insider's trading history. *Zucco*, 552 F.3d at 1005. The fact that Kriegsman allegedly sold approximately 97 percent of his personally-held Galena stock within one week when he had not sold any shares for the previous four years, during a time capitalizing on Galena's artificially-inflated stock price, which had reached its highest value since 2010 the day before Kriegsman began selling his stock, is suspicious. Kriegsman's stock sales as alleged by Plaintiffs thus weigh heavily in favor of a scienter inference.

Additionally, Plaintiffs allege that Kriegsman was familiar with DreamTeam and how it operated because Kriegsman had hired DreamTeam to promote CytRx, Galena's former parent company of which Kriegsman was the CEO.  CytRx sold more than $74.5 million of its stock while a DreamTeam client. Kriegsman or his personal assistant at CytRx made changes to articles drafted by undercover analyst Mr. Pearson posing as a DreamTeam author.[21] Plaintiffs further allege that CytRx insisted that company management edit and sign off on all articles and

---

[21] The United States District Court for the Central District of California recently issued a civil minute order resolving a motion to dismiss in a similar case alleging a similar promotional scheme and misrepresentations involving CytRx and DreamTeam. *See* Dkt. 148-1, *In Re CytRx Corp. Secs. Litig.*, Case No. CV 14-1956-GHK (PJWx), Dkt. 117 (Jul. 13, 2015) (filed in this case as Dkt. 148-1). In that opinion, the court found it "highly unlikely" that an assistant would make such changes "rather than merely forwarding Kriegsman's edits." *Id.* at 14. The court also found the plaintiffs in that case adequately alleged Kriegsman's scienter.

that all articles not disclose that the writers were being paid.[22] Kriegsman's familiarity with DreamTeam and how it operated on behalf of CytRx supports an inference that Kriegsman was familiar with how DreamTeam was operating on behalf of Galena.

Kriegsman began selling his stock on January 17, 2014, the day after the Galena Board meeting discussed above. Thus, as alleged by Plaintiffs, Kriegsman's sale was either during a trading blackout period or made immediately after the Board lifted the blackout to allow the insiders to trade at the height of the alleged price inflation, both of which support an inference of scienter.

Plaintiffs further allege that an agenda item at the October 11, 2013 and January 16, 2014 Board meetings was a discussion of Galena's investor relations and public relations activities, led by Bernarda. At the time, more than 90 percent of Galena's investor relations expenses were payments to DreamTeam and Lidingo. It is a plausible inference that DreamTeam and Lidingo were included in the discussion of Galena's public relations activities.

Plaintiffs also allege that Galena's Compensation Committee awarded stock options in November 2013, at a time of year when the Company had never before awarded stock options, to take advantage of the promotional scheme. Kriegsman, as chair of the Compensation Committee, was involved in that decision. Further, on December 19, 2013, Kriegsman sought to exercise his options to buy 200,000 shares of Galena and immediately sell them for a profit. Dunlap advised that Kriegsman could not sell at that time because of the trading blackout period. Kriegsman was "insistent" but ultimately did not sell until approximately one month later, on January 17, 2014.

---

[22] The court in *In re CytRx* also found that because CytRx was a small company, it raised the inference that Kriegsman was aware of what his employees were doing to promote company stock. Dkt. 148-1, at 15.

Considering the totality of the Consolidated Complaint, there are sufficient allegations to support a strong inference of Kriegsman's scienter with respect to the alleged promotional scheme. Kriegsman's sale of his Galena stock is highly suspicious. Additionally, his knowledge of DreamTeam through his exposure and both CytRx and Galena, his attempt to exercise his options for an immediate profit during the promotional campaign, and his participation in granting the unusually-timed stock options all demonstrate that the inference of scienter argued by Plaintiffs is as least as compelling as any opposing inference of nonfraudulent intent.

### e.   Chin, Nisi, Hillsberg, and Galliker

Defendant Richard Chin has served on Galena's Board since 2009 and on the Compensation Committee since 2011. He is a co-founder of Kindred Biosciences, Inc. ("Kindred"), a development-stage pet prescription drug company. Plaintiffs allege that Defendant Chin sold 262,500 shares of his Galena stock, representing 100 percent of Chin's personally-held Galena stock. Chin sold his shares on January 30, 2014 and February 12, 2014, during the narrow time frame when the other Galena insiders were selling off their shares. Plaintiffs allege that Chin had not sold any of his personally-held Galena stock in the previous four years. Chin's dramatically out-of-line stock sales weigh heavily in showing scienter. Additionally, Plaintiffs' allegation that Chin was familiar with DreamTeam and how it operated because he had hired DreamTeam to promote the stock of Kindred, which sold more than $106 million in shares while a DreamTeam client, supports an inference of scienter. Further, as a member of Galena's Compensation Committee, Chin participated in the unusually-timed award of stock options in November 2013, during the promotional campaign, which also supports an inference of scienter.

Defendant Rudolph Nisi has served on Galena's Board since 2009 and on the Compensation Committee since 2009. Plaintiffs allege that Nisi sold 450,000 Galena shares,

PAGE 29 – OPINION AND ORDER

representing 98.6 percent of his personally-held Galena stock. Nisi sold his shares on January 17,

2014 and January 29, 2014. Plaintiffs allege that Nisi had not sold any personally-held Galena

stock in the previous four years. Nisi's dramatically out-of-line stock sales weigh heavily toward

an inference of scienter. Further, as a member of Galena's Compensation Committee, Nisi

participated in the unusually-timed award of stock options in November 2013, during the

promotional campaign, which also supports an inference of scienter.

     Defendant Sanford J. Hillsberg has served on Galena's Board since 2007. Hillsberg is

also the managing partner at the law firm TroyGould, which represents various companies that

have employed DreamTeam. Plaintiffs allege that Hillsberg sold 450,000 of his Galena stock,

representing 93.3 percent of his personally-held Galena stock. Hillsberg sold his shares on

January 17, 2014 and January 30, 2014. Plaintiffs allege that Hillsberg had not sold any

personally-held Galena stock in the previous four years. Hillsberg's dramatically out-of-line

stock sales weigh heavily toward an inference of scienter. Additionally, giving Plaintiffs the

benefit of all reasonable inferences, Hillsberg's association with TroyGould supports an

inference that he is familiar with how DreamTeam works and how it allegedly promoted Galena.

     Defendant Stephen S. Galliker has served on Galena's Board since 2007. Galliker is also

the Chief Financial Officer of Kindred. Plaintiffs allege that Galliker sold 300,000 shares,

representing 96.8 percent of Galliker's personally-held Galena stock. Galliker sold his shares on

February 3, 2014. Plaintiffs allege that Galliker had not sold any personally-held Galena stock in

the previous four years. Galliker's dramatically out-of-line stock sale weighs heavily toward an

inference of scienter. Additionally, Plaintiffs' allegation that Galliker was familiar with

DreamTeam and how it operated because he had hired DreamTeam to promote the stock of

Kindred further supports an inference of scienter.

As with Kriegsman, all of these directors were at the Board meetings held in October 2013 and January 2014 when Galena's investor and public relations activities were discussed and, as alleged by Plaintiffs, when the trading blackout was purportedly lifted in the January 2014 Board meeting at the height of Galena's artificially inflated stock price.

Viewing the Consolidated Complaint as a whole, Plaintiffs' allegations against these directors are sufficient to support a strong inference of scienter with respect to the alleged promotional scheme. This is primarily because of their insider sales. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 939-40 (9th Cir. 2003) (finding a strong inference of scienter where insiders sold between 88 and 100 percent of their stock in a three-month time period, when the insiders had not previously sold stock in a long period of time and finding that based on the "the large number and percentages of stocks traded, the timing of the sales, and the prior trading history of each defendant, the stock sales that occurred were clearly 'calculated to maximize the personal benefit from undisclosed inside information,'" despite the fact that most of the insiders had not themselves made any false or misleading statements (citation omitted)). The additional facts relating to scienter, including discussions of the promotional campaign at Board meetings, participation in the unusually-timed award of stock options, and knowledge of DreamTeam based on interactions through companies other than Galena offer further support of an inference of scienter.

### f.  Schwartz

Plaintiffs allege that Schwartz sold 100,000 of his Galena stock, representing 19.6 percent of Schwartz's personally-held Galena stock. Schwartz sold his shares on January 30, 2014. Plaintiffs allege that Schwartz had not sold any personally-held Galena stock in the previous four years. The timing of Schwartz's sale of his personally-held Galena stock and the fact that the sales were out of line with his prior trading practice may support an inference of

PAGE 31 – OPINION AND ORDER

scienter. The amount and percentage of shares Schwartz sold, however, do not support an inference of scienter, as larger percentages are usually required. *See, e.g.*, *Am. West*, 320 F.3d at 939-40 (finding stock sales of between 88 and 100 percent create a strong inference of scienter); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999) (finding that 43.6 percent and 75.3 percent are "somewhat suspicious" while percentages less than 10 were not suspicious). Thus, Schwartz's stock sales are not sufficiently "suspicious" and do not, by themselves, support an inference of scienter. The only other allegation relating to Schwartz is that he attended the Galena Board meetings at which the promotional campaign was discussed. Although this is evidence from which some inference of scienter can be inferred, it is not sufficient to show Schwartz had the requisite scienter. Thus, reviewing the Consolidated Complaint as a whole, there are insufficient allegations to support a strong inference of scienter by Schwartz.

### g.  Galena

"[C]orporate scienter relies heavily on the awareness of the directors and officers." *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008) (quotation marks and citation omitted). The Court has already found that Plaintiffs have adequately alleged the scienter of Ahn and Bernarda, who are officers of Galena, and the Selling Defendants except Schwartz, who are directors of Galena. Their knowledge can be imputed to Galena. Thus, the scienter of Galena has been adequately alleged.

### h.  Michael McCarthy

Most of Plaintiffs' allegations relating to DreamTeam either impermissibly combine the DreamTeam Defendants and the Lidingo Defendants together or generically reference

"DreamTeam" without specifically identifying the involvement or knowledge of McCarthy.[23] Plaintiffs do, however, make some allegations specific to McCarthy. Plaintiffs allege that McCarthy was the "head" of DreamTeam throughout the relevant time period, that he corresponded extensively with Ahn and Bernarda, that McCarthy told an undercover analyst that DreamTeam had a team that monitored and posted on message boards, that McCarthy measured DreamTeam's success by Galena's stock price, that McCarthy worked closely with Meyer, and that McCarthy spoke with Meyer regarding articles that were waiting for Galena's approval.[24]

Plaintiffs also specifically incorporate by reference into the Consolidated Complaint several of the Special Committee Report exhibits that relate to McCarthy. One exhibit is the November 26, 2013 email from McCarthy to Bernarda attaching links to 18 *Seeking Alpha* articles that had been published "since we [DreamTeam] started," none of which contained the required paid promotion disclosure. This email also provided links to the purported biographies of the authors using aliases in the articles, including the allegedly false credentials claimed by the DreamTeam-affiliated aliases and the fact that the biographies did not disclose the authors' paid relationship with DreamTeam. Another exhibit specifically incorporated is an email dated February 4, 2014, from McCarthy to Ahn and Bernarda forwarding draft articles for approval. Another is the December 3, 2013 email from Bernarda to McCarthy, among others, approving a

---

[23] For some conduct, Plaintiffs may not know who at DreamTeam was involved. The exhibits incorporated into the Complaint, however, show that for some of the conduct alleged to be by "DreamTeam," McCarthy is the person at DreamTeam who was involved. In any new amended complaint, Plaintiffs shall specifically identify, if known, who at DreamTeam was involved in the alleged conduct.

[24] *See* CAC ¶¶ 24, 80, 86, 146, 148, 170.

draft article, with revisions. The draft articles sent by McCarthy for approval did not contain the required paid promotion disclaimer.[25]

Moreover, the Court is instructed to consider *all* facts alleged in the Consolidated Complaint. *Tellabs*, 551 U.S. at 322-23; *Zucco*, 552 F.3d at 991. Plaintiffs allege other facts relating to DreamTeam of which it can reasonably be inferred that McCarthy, as the managing member of DreamTeam, was aware. Plaintiffs allege that DreamTeam's purported business offices are an empty store front and that DreamTeam charges significantly more than market value for its services. These allegations support an inference that DreamTeam was not engaging in a legitimate business with respect to its work for Galena.

Plaintiffs also allege that DreamTeam's marketing materials brag about how DreamTeam writers post articles on *Seeking Alpha*, resulting in more than 6,500 views for a single article. *Seeking Alpha*, however, generally does not permit paid articles and requires an affirmative statement that articles posted are not the product of a paid transaction.  If an article is a paid promotion, it must affirmatively state as much.

Plaintiffs further allege that in December 2012 and January 2013, DreamTeam caused five articles to be published on *Seeking Alpha*, all of whom were written by the same author

---

[25] As noted above, because the Special Committee Report and certain of its exhibits are repeatedly referenced in the Consolidated Complaint, the Court may consider the report and all of its attached exhibits. Although not specifically identified in the Consolidated Complaint, the Special Committee Report exhibits include additional emails from McCarthy to Ahn and Bernarda attaching draft articles for their approval and published articles for their records. *See, e.g.*, Exs. 76, 81, 83, 108, 110. One of these emails is an August 7, 2013 email from McCarthy to Ahn and Bernarda that links to the August 6th *Seeking Alpha* article authored by "Wonderful Wizard." This email contains the subject line "GALE [Galena's stock symbol] article published yesterday via our team." McCarthy further notes in the email that the article took "many hours to write" and stating that "we," apparently referring to DreamTeam, cannot make *Seeking Alpha* publish when they want. This shows detailed knowledge of the drafting and publication of the article. These emails, although not necessary for the Court's finding of McCarthy's scienter, further support an inference of his scienter.

using different DreamTeam aliases. *Seeking Alpha* discovered they were written by the same person and removed the articles. After that discovery, those aliases stopped being used by DreamTeam.

Plaintiffs also allege that DreamTeam attempted to cover up its relationship with Galena after the alleged scheme began being reported in the press. Plaintiffs allege that DreamTeam deleted articles, blogs, comments, Twitter feeds, and the compensation disclosure noting the $50,000 payment made by Galena.

These allegations, taken collectively, sufficiently support a strong inference that McCarthy knew that DreamTeam was paying authors to use multiple aliases and false credentials to write articles touting Galena without disclosing that the articles were part of a paid promotion. The allegations that McCarthy forwarded both draft and final articles, all of which failed to disclose the paid relationship, show that McCarthy was aware that the articles did not contain the required disclosure. Further, Plaintiffs' allegations support that McCarthy knew that the authors it was paying were using aliases and false biographies. It can also be reasonably inferred from Plaintiffs' allegations that McCarthy knew this was inappropriate because DreamTeam allegedly charges significantly higher rates for its services, *Seeking Alpha* had previously removed DreamTeam articles for just this reason, and DreamTeam attempted to cover up its relationship with Galena. Plaintiffs' allegations also support an inference that McCarthy was part of a scheme artificially to inflate Galena's stock price. Plaintiffs, however, do not sufficiently allege McCarthy's scienter with respect to the alleged scheme or misrepresentations arising out of Galena's relationship with Lidingo.

### i.  Thomas Meyer

Plaintiffs allege that Meyer was affiliated with DreamTeam, stated to an undercover analyst that Meyer worked for DreamTeam, stated that he worked closely with McCarthy,

PAGE 35 – OPINION AND ORDER

published articles touting Galena under his own name, published articles touting Galena using several aliases with false credentials, recruited other authors to write articles touting Galena and CytRx for money, and told an undercover analyst that the conditions for writing articles for DreamTeam included not disclosing that the article was paid for and not publishing without the company's approval.[26] These allegations are sufficient to support a strong inference of Meyer's scienter that DreamTeam was paying authors to tout Galena without disclosing the paid promotional relationship. Plaintiffs, however, do not sufficiently allege Meyer's scienter with respect to Galena's relationship with Lidingo.

### j.   DreamTeam

The DreamTeam Defendants argue that because Plaintiffs do not adequately plead McCarthy's scienter, Plaintiffs fail adequately to plead DreamTeam's scienter. Plaintiffs respond that they adequately plead McCarthy's scienter, that Meyer is either an employee or an agent of DreamTeam and his scienter can therefore be imputed onto DreamTeam, or that one of the group scienter pleading exceptions applies.

Because the Court has found that Plaintiffs sufficiently allege McCarthy's scienter, the scienter of DreamTeam is sufficiently alleged with respect to its relationship with Galena. The Court need not address whether Meyer is an employee or agent of DreamTeam or whether the group pleading doctrines of "collective scienter" or "core operations" scienter are applicable in this case.

### k.   Kamilla Bjorlin

As with the allegations relating to DreamTeam and its alleged employees, many of the allegations relating to Lidingo are impermissible group allegations. There are several allegations,

---

[26] *See* CAC ¶¶ 23, 97, 99, 146-48.

however, that are specific to Bjorlin.[27] Plaintiffs allege that Bjorlin was the "head" of Lidingo throughout the relevant time period and that she corresponded extensively with Ahn and Bernarda throughout Lidingo's relationship with Galena. Plaintiffs allege that in April 2012, Bjorlin sent an email to a Galena manager asking about payment and noting that "the writers are due to be paid on the fifth." Plaintiffs further allege that in November 2012 Bjorlin solicited Ahn for another promotional campaign, promising that if Lidingo did not increase Galena's stock price by 25 percent by year's end, Lidingo would refund its fee. Plaintiffs also allege that on April 19, 2013, Bjorlin sent an email reminding Ahn that using Lidingo for promotional services "provided a layer of protection" and was "safer" than performing those services in-house.

Plaintiffs also incorporate by specific reference numerous exhibits to the Special Committee Report that relate specifically to Bjorlin, most of which are emails to and from Bjorlin and Galena.[28] In the emails, Bjorlin describes how a Lidingo promotional campaign worked. She notes that Lidingo assigned writers to Galena, published articles by "our writers" on various websites and distributed them directly via "huge" email campaigns. Bjorlin goes on to describe how Lidingo "leveraged" news releases and used message boards to increase traffic to the published articles and that message boards were "monitored closely" and would continue to be "worked" throughout the promotional campaign. Bjorlin further notes that Lidingo is able to "work directly" with *Seeking Alpha*. In one email dated April 12, 2013, Bjorlin notes that she has sent Ahn the articles that Lidingo had written. Although these emails are from before the relevant time period, it is a reasonable inference that Lidingo's services and methods of operation used in 2012 and through April 2013 did not change in July 2013.

---

[27] *See* CAC ¶¶ 26, 156, 165, 167, 173.

[28] *See* Exs. 36, 56, 58-59, 62, 66-67, 69, 70, 82, 84-85, 170.

PAGE 37 – OPINION AND ORDER

With regard to payment, the emails incorporated by reference show that Bjorlin explains to Ahn that Lidingo's expenses are high. She then notes that Bernarda agreed to cover Lidingo's expenses in addition to the flat monthly fee. Bjorlin also requests that Lidingo be paid in stock options as well as cash "to ensure we are appropriately compensated for the hard work and the risks, as well as performance." She also suggests Lidingo receive "an equity stake of some kind." Plaintiffs allege that Ahn eventually agreed to issue Lidingo stock options. In a November 13, 2013 email, Bjorlin asks Dunlap to provide her with a copy of "the option agreement and any necessary doc[ument]s associated for the execution of the option shares awarded Lidingo from our agreement."

Bjorlin is also the person at Lidingo who signed its 2012 promotional services contract with Galena. Although the 2013 promotional services contract is not incorporated by reference, it can reasonably be inferred that Bjorlin is familiar with its terms based on the emails showing her negotiations regarding terms, her knowledge of the stock option agreement, and the fact that she signed the 2012 contract.

These allegations are sufficient to support a strong inference of Bjorlin's scienter. The allegations and documents incorporated by reference show that Bjorlin knew Lidingo paid writers, knew Lidingo published articles on *Seeking Alpha* (which generally prohibits paid promotional articles), and knew those articles did not contain the required paid disclaimers. Further, the allegations that Bjorlin counseled Ahn that having Lidingo operate the promotional campaign offered "protection" and was "safer," coupled with the fact that Bjorlin sought stock options to compensate for the "risk" that Lidingo was taking supports a strong inference that Bjorlin knew the campaign conducted by Lidingo was improper. If the campaign was not improper, then Lidingo was not facing any particular "risk" by engaging in the campaign. In a

legitimate advertising and promotional campaign, the campaign may succeed or fail, but the only "risk" to the public relations firm is the general business risk that if the campaign fails a dissatisfied customer will hire another firm in the future. The inference that Bjorlin was seeking equity-based compensation for Lidingo, in addition to the $20,000 monthly fee plus expenses, to counter the normal business risk of losing a customer is not as compelling as the inference that she was seeking such compensation for the risk that Lidingo would be caught engaging in an illegal promotional campaign.

Plaintiffs sufficiently plead Bjorlin's scienter with respect to the alleged promotional scheme and false or misleading statements relating to Lidingo's relationship with Galena. Plaintiffs do not, however, sufficiently plead Bjorlin's scienter with respect to Galena's relationship with DreamTeam.

### l.  Lidingo

Because the Court has found that Plaintiffs properly plead Bjorlin's scienter, the scienter of Lidingo is sufficiently alleged with respect to the alleged promotional scheme and false or misleading statements relating to Lidingo's relationship with Galena.

### m.  Conclusion

In sum, Plaintiffs sufficiently allege scienter against: Ahn, Kriegsman, Chin, Nisi, Hillsberg, Galliker, and Galena with respect to the alleged promotional scheme and false or misleading statements arising out of Galena's relationship with both DreamTeam and Lidingo; Bernarda, DreamTeam, McCarthy, and Meyer with respect to the alleged promotional scheme and false or misleading statements relating to Galena's relationship with DreamTeam; and Lidingo and Bjorlin with respect to the alleged promotional scheme and false or misleading statements relating to Galena's relationship with Lidingo. Plaintiffs do not sufficiently allege scienter against Dunlap or Schwartz.

PAGE 39 – OPINION AND ORDER

**D.  First Claim for Relief: Section 10(b) and Rule 10b-5**

Section 10(b) of the Exchange Act makes is "unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations the Commission may prescribe." 15 U.S.C. § 78j. Rule 10b-5, implementing Section 10(b), states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

Defendants argue that in Plaintiffs' first claim, they allege only a violation under Rule 10b-5(b). The heading of Plaintiffs' first claim states that it is for violations of Section 10(b) and Rule 10b-5(b). The allegations within that claim, however, are that Galena, Ahn, Bernarda, Dunlap, the DreamTeam Defendants, Meyer, and the Lidingo Defendants[29] "carried out a plan, scheme and course of conduct" to deceive the investing public, "employed devices, schemes and artifices to defraud," "engaged in acts, practices, and a course of conduct" to defraud and "engaged in transactions, practices and a course of business that operated as a

---

[29] Claim One is not asserted against the Outside Directors or Defendant Schwartz.

fraud and deceit." CAC ¶¶ 253, 255. Additionally, the Consolidated Complaint alleges that the claims asserted "arise under §§ 10(b), 20A, and 20(a) of the Exchange Act . . . and Rule 10b-5(a)-(c) promulgated thereunder." *Id.* ¶ 13. Moreover, throughout the Consolidated Complaint, Plaintiffs allege that Defendants engaged in a fraudulent "scheme," including a "scheme to manipulate Galena's stock price." *See, e.g.*, *id.* ¶¶ 2, 3, 6, 9, 11, 78, 82, 102, 131, 139, 253, 255. The Court finds the Consolidated Complaint provides sufficient notice that Plaintiffs are bringing claims under all three sections of Rule 10b-5, specifically, sections (a), (b), and (c). The Court thus analyzes whether the Consolidated Complaint sufficiently states a claim under any of those three sections.

### 1. Rule 10b-5(b)

Defendants argue that Plaintiffs' 10b-5(b) claim fails because Plaintiffs do not adequately plead: (a) a material misrepresentation or omission; (b) that any misrepresentation or omission was "made by" any Defendant; (c) scienter; (d) reliance; and (e) loss causation. The DreamTeam Defendants also argue that Plaintiffs do not adequately plead that the alleged misrepresentations were made "in connection with" the purchase or sale of a security. Each argument exccept scienter, which was discussed previously, is addressed in turn.

### a. Material misrepresentations or omissions

Plaintiffs allege both direct misrepresentations and omissions by Galena and its officers and misrepresentations and omissions through publications placed by DreamTeam or Lidingo.

### i. September 13, 2013 8-K filing

Plaintiffs allege that to conduct Galena's September 2013 secondary offering, on September 13, 2013, Galena entered into an Underwriting Agreement, which was attached as an exhibit to Galena's 8-K filing with the SEC made that same day. This Underwriting Agreement contained a clause stating that:

> The Company has not taken, nor will it take, directly or indirectly, any action designed to or which might reasonably be expected to cause or result in, or which has constituted or which might reasonably be expected to constitute, the stabilization or manipulation of the price of the Common Stock or any security of the Company to facilitate the sale or resale of any of the Securities.

CAC ¶ 105. Plaintiffs allege this statement is false because at that time Galena had already hired DreamTeam for the purpose of illegitimately manipulating Galena's stock price so the insiders could sell their stock at inflated prices.

Defendants respond that this statement is not actionable because it was a private statement between Galena and its underwriter, Oppenheimer & Co. ("Oppenheimer"), and was a warranty only between Galena and Oppenheimer, as a different clause in the Underwriting Agreement expressly established. Thus, argue Defendants, the investing public was informed that this was a private warranty solely for the benefit of Oppenheimer and the statement is not actionable. Defendants primarily rely on *S.E.C. v. Tex. Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), for the proposition that a statement must be made "in a manner reasonably calculated to influence the investing public" to be sufficiently connected to the sale or purchase of securities and therefore actionable. 401 F.2d at 862. The Ninth Circuit, however, while noting *Texas Gulf Sulphur's* holding, held that statements are sufficiently "connected" and actionable "if the fraud alleged 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'" *S.E.C. v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) (quoting *S.E.C. v. Clark*, 915 F.2d 439, 449 (9th Cir.1990)); *see also S.E.C. v. Zandford*, 535 U.S. 813, 824-25 (2002) (connection sufficient if it "coincides" with securities transactions). "Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus *or other such document on which an investor would presumably rely*, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the

misrepresentation or omission." *Rana Research*, 8 F.3d at 1362 (emphasis added); *see also Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011) ("A statement or omission is misleading in the securities fraud context 'if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'"). The Supreme Court also has emphasized that the Exchange Act "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Zandford*, 535 U.S. at 819 (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972)).

The Ninth Circuit has rejected a similar argument that statements or omissions in a private contract cannot be actionable in a securities fraud action. *Reese*, 643 F.3d at 691. The court held that a statement contained in a private contract that was publicly filed may be actionable. *Id.* The critical issue for the court in *Reese* was whether the alleged statement was one upon which a reasonable investor could rely. *Id.* The court found it not to be, because the allegedly false and misleading statement in the contract was a generic promise to conduct future operations in a prudent manner. *Id.* The court in *Reese* explained that as a matter of contractual interpretation, forward-looking promises are not a certification that the promisor will actually perform those acts and that contracts include the concept of "efficient breach." *Id.*[30] The court noted that it could be an actionable misstatement "if a reasonable investor would view it as a certificate of [the defendant's] compliance with that standard." *Id.*

Here, the statement contained in the Underwriting Agreement was publicly disseminated and was part of Galena's disclosures relating to its secondary offering. The Court finds that the allegedly misleading statement was actionable and was in connection with the sale of a security.

---

[30] The Ninth Circuit in *Reese*, however, noted that failure to perform a future promise might constitute fraud if, when the promise was made, the promisor secretly intended not to perform or knew that he or she could not perform. 643 F.3d at 691.

Although the Underwriting Agreement contains a clause stating that the warranties and representations were made only to the underwriter, at this stage it is a plausible inference that a reasonable investor would believe that the statements and representations made to the underwriter were truthful and could be relied upon. Unlike in *Reese*, a reasonable investor could view the representation that Galena had not taken any action to manipulate its stock price as certification of that fact. The allegedly misleading statement therefore reasonably created an impression of a state of affairs—that Galena was not engaging in activities to manipulate its stock price—that differed in a material way from the one that allegedly existed. *Id.* This representation was one on which a reasonable investor could rely and was material. Thus, the connection requirement is satisfied. *Rana Research*, 8 F.3d at 1362; *see also S.E.C. v. Savoy Indus., Inc.*, 587 F.2d 1149, 1171 (D.C. Cir. 1978) (noting that "this [in connection with] requirement is satisfied whenever it may reasonably be expected that a publicly disseminated document will cause reasonable investors to buy or sell securities in reliance thereon"); *S.E.C. v. e-Smart Techs., Inc.*, --- F. Supp. 3d ---, 2014 WL 6612422, at *9 (D.D.C. Nov. 21, 2014) ("Because the Samsung release was a public document on which investors would rely, the misrepresentations were made 'in connection with' the sale of securities.").

Defendants also argue that this statement is not false because Plaintiffs do not state a claim for "market manipulation." In arguing that Plaintiffs do not allege market manipulation, Defendants rely on the following dicta by the Ninth Circuit generally summarizing the difference between a manipulation claim and an omissions claim:

> Here, Investors allege manipulative conduct and omissions by Deutsche Bank. "Manipulation," the Supreme Court has recognized, "is virtually a term of art when used in connection with securities markets. The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Santa*

> *Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977) (internal
> quotation marks and citation omitted). As for omissions, the term
> generally refers to the failure to disclose material information
> about a company, as opposed to affirmative manipulation.

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938-39 (9th Cir. 2009).

The Court finds Defendants' argument unpersuasive. First, the term "manipulation" as used in the Underwriting Agreement does not appear to be used as narrowly as Defendants suggest. The clause uses broad wording, asserting that Galena has not "directly or indirectly" taken "any action" designed to or that might reasonably be expected to constitute the "stabilization or manipulation" of Galena's stock price. Second, as discussed below, the Court finds that Plaintiffs adequately allege a "scheme" or "manipulation" claim artificially to inflate Galena's stock price. Accordingly, the statement that Galena had not taken "any action" to stabilize or manipulate Galena's stock price is sufficiently alleged to be false.

### ii.  September 13, 2013 prospectus

Also as part of its secondary offering, Galena published a Prospectus, in which Galena noted that there have been and may continue to be possible fluctuations in its stock price. Galena then explained that price fluctuations are caused by many reasons and provided twelve possible reasons, none of which included the alleged promotional campaign. Defendants argue that the promotional campaign did not need to be disclosed because the listed risks were only risks that might reduce the stock price, not increase it. Ahn separately argues that the campaign did not need to be disclosed because it was alleged to increase the price of stock and an increase is not "fluctuation," which means both increase and decrease. Both of these arguments are unavailing.

The disclosure provided in the Prospectus does not list reasons the stock price may decline, but reasons the stock price may be "volatile" and "fluctuate." Volatile and fluctuate both imply movement in two directions—prices increasing *and* decreasing. *See, e.g.*, Webster's Third

New Int'l Dictionary 2562 (3d ed. 2002) (defining "volatile," with respect to markets, as "subject to or characterized by wide price fluctuations"); Cambridge Business English Dictionary (defining "market fluctuation" as "a situation in which share prices go up and down") (available at http://dictionary.cambridge.org/us/dictionary/business-english/fluctuating-market). The risks disclosed in the Prospectus included risks that could both increase Galena's stock price (such as clinical trial reports, quarterly operating results, announcements of business or strategic transactions, announcements of regulatory developments, and developments in patent or technology rights), and risks that could decrease Galena's stock price (such as public concern regarding the safety of Galena's products, funds not being available for financing, and the decline in stock prices for other large companies within Galena's industry). Nothing in the nature of the risks disclosed limits the potential risks to risks that would move Galena's stock price only in one direction, or necessarily in both directions. Thus, Defendants' and Ahn's arguments that the nature of how the alleged paid promotional campaign would affect Galena's stock price did not fall within the types of risks that might cause a price fluctuation disclosed in the Prospectus are without merit.

Moreover, the scheme, as alleged, had the risk of making Galena's stock price both increase and decrease. If the alleged plan was successful, the stock price would increase. If the alleged secret paid promotional campaign came to light, the stock price would decrease, as happened. Additionally, the fact that, as alleged, Company insiders were planning to sell large amounts of personally-held stock after the price was inflated could also result in a decrease in the stock price, after the public became aware of an insider sell-off, even if the alleged promotional campaign was not discovered. Thus, the alleged scheme was a risk that might result in the fluctuation of Galena's stock price, up or down.

Regardless of whether Galena had an independent duty to disclose the paid promotional campaign in its SEC filings, Rule 10b-5(b) "prohibits the telling of material half-truths, where the speaker 'omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *U.S. v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (quoting Rule 10b-5(b)). After Galena chose to disclose a lengthy list of reasons why its stock price might fluctuate, it needed to include in that list the alleged scheme that Galena was manipulating the stock price with the help of DreamTeam and Lidingo. *See Ansell v. Laikin*, 2011 WL 3274019, at *4 (C.D. Cal. Aug. 1, 2011) (finding a material omission where "Defendant represented in the Tender Offer that past and future stock price fluctuations were due to factors beyond the Company's control, but did not disclose that Defendant had been manipulating the stock price with the help of the stock promoter" because by "failing to mention [the] scheme but listing several other risks" in the Tender Offer, the company "misled investors into believing that the Tender Offer had disclosed all known risks of investing in the Company").

### iii. Galena's 2013 third quarter 10-Q/A

Plaintiffs allege that Galena's SEC Form 10-Q/A filed on November 6, 2013, was misleading because the report asserts that it does not omit a material fact and that the signatories have disclosed to Galena's auditors any fraud that involves management or other employees. Plaintiffs allege that this statement was false or misleading because at that time, Galena had engaged DreamTeam and Lidingo in the scheme illegitimately to boost Galena's stock price and did not disclose that fact to the auditors. Because the Court finds that Plaintiffs have adequately alleged that Galena made false or misleading statements and engaged in a fraudulent scheme (discussed further below), the statement that any fraud involving management had been disclosed to auditors was an actionable misrepresentation.

PAGE 47 – OPINION AND ORDER

### iv.  Galena's Code of Ethics

Plaintiffs allege that Galena's Code of Ethics, adopted in January 2012, is false or misleading because Galena's officers and directors violated it when they engaged in insider trading in January 2014. Even assuming that the Selling Defendants engaged in insider trading as alleged, the Court finds that the statements in Galena's Code of Ethics are not actionable statements under Rule 10b-5(b). Plaintiffs do not allege any statement by Galena or an individual Defendant that he or she was complying with the Code of Ethics when he or she was not complying with the Code of Ethics. The only allegations are that the Code of Ethics was publicly available on the website, includes a sentence that Galena will not sanction or tolerate conduct that risks a violation of federal law, and the Selling Defendants violated the law. This is insufficient to rise to the level of a material misrepresentation for securities fraud. *See, e.g.*, *Retail Wholesale & Dep't Store Union Local*, 52 F. Supp. 3d 961, 970-71 (N.D. Cal. 2014) (finding statements in code of conduct not material and not actionable in the absence of a statement that the company or its employees were complying with the code of conduct); *Cement & Concrete Workers Dist. Council Pension*, 964 F. Supp. 2d 1128, 1138-39 (N.D. Cal. 2013) (finding statements in a code of ethics not actionable because they are not material and are merely vague statements of corporate optimism) (gathering cases).

### v.  Lidingo publications

Plaintiffs allege that the many articles, blogs, and email blasts by Lidingo were misleading because they did not disclose that the publications were part of a paid promotional campaign. Such disclosures are required under Section 17(b) of the Securities Act of 1933.[31] Defendants argue that Plaintiffs do not sufficiently plead any misleading statement by Lidingo.

---

[31] *See* note 3, *supra*.

Plaintiffs allege that Lidingo used numerous aliases on Facebook, Twitter, and other social media to call attention to DreamTeam and Lidingo articles, thereby giving them more validation; paid writers and was reimbursed by Galena for that expense; published articles and email blasts that did not disclose that they were part of a paid campaign; and provided copies of published articles and email blasts to Ahn and Dunlap. Plaintiffs note an email during Galena's 2012 engagement of Lidingo, where Lidingo describes itself as having published original articles by its writers on various websites, distributed them directly to hundreds of thousands of investors, used third-party message boards to drive traffic to those articles, and monitored and "worked" message boards to insert pro-Galena messages. Plaintiffs also allege that Galena's Special Committee, which conducted an investigation into the conduct at issue in this lawsuit, concluded that Lidingo likely had violated federal security laws.[32]

The PLSRA requires that for a claim based on a fraudulent statement or omission, the complaint must "specify each statement alleged to have been misleading" and the reasons why that statement is misleading. 15 U.S.C. § 78u-4(b)(1)(B). If an allegation of a statement or omission is based on information and belief, the complaint must state with particularity all facts on which that belief is formed. *Id.* "In considering if a complaint meets the heightened requirements of the PSLRA, a court should consider the complaint in its entirety." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011).

Here, Plaintiffs do not allege with particularity any specific article, email, or blog post published by Lidingo within the relevant time period or why any particular communication is false or misleading. Plaintiffs also do not plead with particularity any specific article caused to be

---

[32] *See* CAC ¶¶ 12, 80, 165, 166, 166, 167, 189.

published by Lidingo that failed to contain the required disclosure that it was a paid promotional publication.

The Consolidated Complaint, however, contains factual allegations and incorporates by reference emails showing that Lidingo's services to Galena generally included providing articles and email blasts. These include an April 9, 2013 email in which Bjorlin states that "we [Lidingo] have already set up huge email campaigns and assigned writers to promote the company"; an April 11, 2013 email in which Ahn requests Bjorlin send him the "five articles"; the April 12, 2013 email in which Bjorlin notes she has sent Ahn the articles; the April 19, 2013 email in which Bjorlin states that Lidingo has "several articles in the queue" and reminds Ahn that Lidingo's services are useful because Lidingo "provides a layer of protection" and a "safer" option; and a November 20, 2013 email in which Ahn requests that Bjorlin send Ahn "the email blast you noted." Plaintiffs further allege that Galena and Lidingo entered into a contract for promotional services in July 2013 at significantly higher fees than the "legitimate" investor relations firm Tiberend received, and that Galena's Special Committee determined that Lidingo likely violated securities law.

Plaintiffs' allegations relating to Lidingo are sufficient to support an alleged promotional "scheme" claim under 10b-5(a) or (c) (discussed further below). To the extent Plaintiffs intend to allege a separately actionable false or misleading statement under 10b-5(b), however, Plaintiffs do not allege with particularity what is false or misleading about any specific promotional publication issued by Lidingo. Plaintiffs do not identify a single article published as a result of Galena's relationship with Lidingo that did not contain the required disclosure that the article was part of a paid promotional campaign. Plaintiffs also fail to identify any specific email or social media post or explain how and why any specific email or post was false or misleading.

Plaintiffs' allegations of Lidingo's concurrent social media and blog campaign are insufficient under the PLSRA to plead with particularity a misrepresentation or omission.[33]

### vi. DreamTeam publications

Defendants do not dispute that the articles touting Galena published by the writers paid by DreamTeam failed to contain the required disclosure that they were paid promotional communications. Defendants instead argue that they cannot be held liable for those false or misleading statements because no Defendant "made" those statements and Plaintiffs fail properly to allege the other elements of a securities fraud claim. The other elements of a securities fraud claim are analyzed below. With respect to whether Plaintiff sufficiently alleged that the articles published through Galena's relationship with DreamTeam were false or misleading, the Court finds that has been sufficiently alleged.

Plaintiffs also allege, however, that DreamTeam published false or misleading blog posts, social media posts, and comments on investor websites. Plaintiffs make two specific allegations to this effect. The first is that immediately after causing a promotional article to be published on *Seeking Alpha* on August 6, 2013, DreamTeam authors then used two aliases to post on Yahoo! Finance comments telling readers to "check out" the article and that the person posting the comment was going to buy Galena stock the next day.  The second is that when DreamTeam caused an article to be published on *Seeking Alpha* on November 27, 2013, that same day on its blog DreamTeam touted that an author had posted a bullish article about Galena on *Seeking Alpha*, without disclosing DreamTeam's connection to that author and that article.

---

[33] The Court also notes that Plaintiffs do not plead facts sufficient to show who are the "makers" of Lidingo's emails, blog posts, or articles. Unlike the allegations relating to published articles written by authors hired by DreamTeam, which allegedly could not be published without Galena's approval, with respect to alleged Lidingo publications, there are no allegations showing who had the ultimate authority over the content of those publications.

Plaintiffs' allegations relating to DreamTeam's social media posts support an alleged promotional "scheme" claim under 10b-5(a) or (c) (discussed further below). To the extent Plaintiffs intend to allege a separately actionable false or misleading statement under 10b-5(b), however, Plaintiffs do not allege with particularity what is false or misleading about those posts. Plaintiffs' allegations of DreamTeam's concurrent social media and blog campaign are insufficient under the PLSRA to plead with particularity a misrepresentation or omission.[34]

### vii. Conclusion

Plaintiffs sufficiently allege under Rule 10b-5(b) actionable misrepresentations or omissions in: (1) the Underwriting Agreement contained in Galena's September 13, 2013 8-K filing; (2) Galena's September 13, 2013 prospectus; (3) Galena's 2013 third quarter 10-Q/A; and (4) the articles published in connection with Galena's relationship with DreamTeam. Plaintiffs do not sufficiently allege specific misrepresentations or omissions in: (1) Galena's Code of Ethics; (2) Lidingo publications; and (3) DreamTeam publications other than the published articles. Claims under Rule 10b-5(b) based on those allegations are dismissed.

### b. Misrepresentations "made by" Defendants

The Supreme Court recently clarified that only the "maker" of a statement can be held liable for alleged misrepresentations and omissions under Rule 10b-5(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). In *Janus*, the Supreme Court also explained that the "maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 2302. The Supreme Court

---

[34] As with the allegations regarding Lidingo's alleged publications, the Consolidated Complaint also fails to allege sufficient facts to determine who are the "makers" of these particular posts. The Consolidated Complaint alleges that the articles were reviewed and approved by Galena, but is silent with respect to any approval by Galena of DreamTeam's blog and social media posts.

also noted that "[o]ne who prepares or publishes a statement on behalf of another is not its

maker." *Id.*

The Court has found that there were actionable misrepresentations in three of Galena's

publicly disseminated documents and in the articles published as a result of Galena's relationship

with DreamTeam. The Court next analyzes whether Plaintiffs adequately allege that any of

Defendants against whom Plaintiffs' Rule 10b-5(b) claim is alleged are the "makers" of those

actionable misrepresentations.

### i. Galena's publicly disseminated documents

The Court has found that Plaintiffs sufficiently allege misrepresentations or omissions in:

(1) the Underwriting Agreement contained in Galena's September 13, 2013 8-K filing;

(2) Galena's September 13, 2013 prospectus; and (3) Galena's 2013 third quarter 10-Q/A. The

signatories to those documents, and through them, Galena, are "makers" of statements contained

in those documents. *See Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *3

(N.D. Cal. Mar. 26, 2015) (finding that the corporate employee who signed the contract was the

"maker" of the allegedly false or misleading statements within the contract); *S.E.C. v. e-Smart

Techs., Inc.*, 31 F. Supp. 3d 69, 80 (D.D.C. 2014) ("Courts have consistently held that the signer

of a corporate filing is its 'maker,' because signing a filing implies 'ultimate control' over its

contents."); *S.E.C. v. Brown*, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) ("Both before and after the

decision in *Janus*, courts have consistently held that the signer of a corporate filing is its

'maker.'").

Plaintiffs allege that Ahn signed the Underwriting Agreement. As the signor, Ahn, and

Galena through him, are the makers of the allegedly false or misleading statements contained in

the Underwriting Agreement. Plaintiffs also allege that Galena's 2013 third quarter 10-Q/A was

signed by Dunlap and Ahn, who also signed its accompanying Sarbanes-Oxley certification.

Dunlap and Ahn, as signors, and Galena through them, are the makers of the allegedly false or misleading statements contained in Galena's 2013 third quarter 10-Q/A.[35]

Plaintiffs do not allege, however, who, if anyone, signed Galena's September 2013 Prospectus. Plaintiffs also do not allege facts regarding who prepared or otherwise was responsible for the content of Galena's September 2013 Prospectus. Because it is a statement by Galena, Galena is the maker of the allegedly false or misleading statements contained within Galena's September 2013 Prospectus. Ahn, Dunlap, and Bernarda (the individual defendants at Galena against whom Claim One is asserted), however, are not alleged to have had ultimate authority over the content of the Prospectus. Thus, Plaintiffs have not adequately alleged any individual defendant to be the maker of the allegedly false or misleading statements contained in the Prospectus.

## ii. DreamTeam-related articles

Defendants argue that none of them are the "makers" of the allegedly false or misleading articles published through Galena's relationship with DreamTeam. Defendants argue that the individual authors had the ultimate authority over the content and publication of the allegedly misleading published articles and thus are the only "makers" of the statements contained in those articles. Galena and its officers and directors argue in the alternative that if the individual authors are not the "makers" of the statements, then DreamTeam and McCarthy are. Conversely, DreamTeam and McCarthy argue in the alternative that if the individual authors are not the

---

[35] The Court notes that scienter is a required element of any securities fraud claim (whether under Rule 10b-5(a), (b), or (c)). Thus, because the Court has found that Plaintiffs do not adequately allege Dunlap's scienter, Plaintiffs' claim of securities fraud against Dunlap has not been sufficiently alleged. The Court analyzes the remaining elements of Plaintiffs' securities fraud claim against Dunlap, however, so that if an amended complaint is filed and Plaintiffs cure the deficiencies identified by the Court with regard to the allegations of Dunlap's scienter, the parties have the benefit of the Court's ruling regarding all of the other elements of a claim for securities fraud raised in Defendants' motions.

"makers" of the statements, then Galena, Ahn, and Bernarda are. As alleged by Plaintiffs, the

final authority over the articles belonged to Ahn and Bernarda, and through them, Galena.[36]

Thus, they are the "makers" of the statements contained in the published articles.

Plaintiffs allege that Ahn and Bernarda had to, and did, approve every article before it

could be published. Plaintiffs also allege that authors paid by DreamTeam were informed that a

condition imposed by Galena is that the articles could not be published without Galena's

approval. The publication process used by DreamTeam with its clients was described to one

author as: (1) DreamTeam would give the author an assignment; (2) the author would submit a

draft article to DreamTeam; (3) DreamTeam would forward the draft to DreamTeam's "biotech

company" client; (4) that client company would edit and approve the article; and (5) DreamTeam

would send the approved article back to the author for publication and would pay the

author $300.

Plaintiffs allege email correspondence in which Meyer, purporting to speak on behalf of

DreamTeam, discussed how one article about Galena did not address a short attack on the

Company because the article had been submitted for approval before the attack but not approved

for publication by Galena until after. Meyer noted in the email exchange that Galena took a long

time to approve articles and there was nothing he could do about it because it was "up to

[Galena] unfortunately." Plaintiffs also allege that an author submitted an article about Galena

and was later informed by Meyer that Galena was putting a hold on the publication of all articles,

but that DreamTeam would still pay the author for the article. Plaintiffs further allege that Ahn

and Bernarda edited and approved all of these the articles before they were published. Plaintiffs'

allegations show that Ahn and Bernarda, and not DreamTeam or the article's author, had the

---

[36] *See* CAC ¶¶ 7, 10, 85, 89-95, 97-100, 146-48, 186, 217; *see also* CAC Ex. D; Special
Committee Report exhibits incorporated by reference.

final, or ultimate, authority to publish the articles and had the final say about the article's content. Thus, as alleged, the authors hired by DreamTeam were merely drafting the articles, but Ahn, Bernarda, and Galena, had the final word regarding approved content and whether the article would be published.

Defendants also argue that the articles were written by, and attributed to, the individual authors. Defendants argue that, under *Janus*, the attribution within the articles serves to prove that the authors are the "makers" of the statements contained in the articles. This argument is unavailing. The Supreme Court in *Janus* noted that in the "ordinary case" attribution within a statement is "strong evidence" that the statement was made by the party to whom it is attributed. *Janus*, 131 S. Ct. at 2302. The allegations in this case, however, contend that this case is not ordinary and the attribution within the articles is virtually meaningless. Most of the articles were written under false aliases, including obvious aliases like "Kingmaker" and "Wonderful Wizard." No reasonable reader would believe that the statements contained in the article were made by someone actually named "Kingmaker" or "Wonderful Wizard." The purported biographies associated with the author aliases also were allegedly false. The Court thus finds that the attribution contained within the articles themselves is not "strong" evidence that those false aliases were the "makers" of the statements contained in the articles.

Defendants' argument that only the individual authors are the "makers" stretches the holding of *Janus* too far. As alleged in this case, Galena was paying for promotional articles with a requirement and understanding that the articles would not disclose the paid promotional relationship, and with Galena keeping the final say on the content of the articles and whether they could be published. If the Court were to consider the individual authors as the makers of those statements, then companies could avoid liability under the Exchange Act simply by paying

third parties to write and publish false or misleading statements about the company, even when the company retains final decision-making authority over content. The holding in *Janus* does not support such a broad reading.

The analysis in *Janus* rested on the fact that one business entity had a statutory obligation to file, and did file, allegedly misleading documents with the SEC, while another legally distinct business entity merely contributed content that the first company could choose whether to include in the SEC filing. *Janus*, 131 S.Ct. at 2304. The Supreme Court held that the business entity that contributed the content was not the "maker" and only the entity that decided what content to include in the final filing with the SEC and filed with the SEC was the "maker" of the statements contained in the SEC filing. No analogous situation is involved here. If the Court were to draw parallels with the facts of *Janus*, the individual DreamTeam-affiliated authors are more analogous to the company that contributed the draft content (and was not the "maker") than the company that retained final approval over the documents (the "maker"). Although the authors may be the ones who pressed "send" on a submission to *Seeking Alpha* and the other online forums that published the articles, as alleged Ahn and Bernarda are the persons who decided what content to include in the final article and whether any particular article would be published.

Plaintiffs' argument that the individual DreamTeam-affiliated authors are not the "makers" of the statements contained in the articles is well taken. Plaintiffs also argue, however, that both Galena and DreamTeam had ultimate authority over the published articles. Plaintiffs cannot have it both ways. Galena and DreamTeam are two separate, legally distinct business entities. If Galena, through Ahn and Bernarda, retained the ultimate authority over the content and publication of the articles, then DreamTeam necessarily did not have ultimate authority over those same articles, and vice versa. The lesson of *Janus* is that where legally distinct entities are

PAGE 57 – OPINION AND ORDER

involved, only one entity has the final say in what, if anything, is published. Plaintiffs do not

plead that Galena had ultimate authority over some articles and DreamTeam over others.

Plaintiffs also do not plead in the alternative, that Galena had ultimate authority but if not

Galena, then DreamTeam. Instead, Plaintiffs plead that Ahn and Bernarda had to approve every

article and that no article could be published without their approval. These allegations assert that

Ahn and Bernarda, and not DreamTeam, had final authority over the articles. *See, e.g.*, *e-Smart*

*Techs.*, 2014 WL 6612422, at *8 (finding it to be "an inescapable conclusion" that the company

CEO was the "maker" under *Janus* of statements contained in a press release because although a

public relations consultant drafted the press release, the CEO edited and approved it before

publication).

### iii. Conclusion

Plaintiffs sufficiently allege that Ahn and Galena are the makers of the statements

contained in the Underwriting Agreement contained in Galena's September 13, 2013 8-K filing,

Galena is the maker of the statements contained in the September 13, 2013 prospectus, and Ahn,

Dunlap, and Galena are the makers of the statements contained in Galena's 2013 third

quarter 10-Q/A. Plaintiffs also sufficiently allege that Ahn, Bernarda, and Galena are the makers

of the allegedly false and misleading articles published through Galena's relationship with

DreamTeam.

### c. Reliance and Materiality

Defendants argue that Plaintiffs have not sufficiently pled reliance through a fraud-on-

the-market theory because there was no allegedly false or misleading information about Galena

or its business. Defendants argue that the only allegedly misleading information involved non-

company specific information; *to wit* the identity and potential bias of the authors of the

published articles. Plaintiffs respond that the fraud-on-the-market doctrine assumes that in an

efficient market a stock price includes *all* publicly available information, which includes the

alleged misrepresentations and omissions involved in this case. In their reply, Defendants do not

respond to Plaintiffs' arguments relating to reliance.

The Supreme Court recently reiterated and reaffirmed the fraud-on-the-market doctrine as

follows:

> *Basic*[, *Inc. v. Levinson*, 485 U.S. 224 (1988)] held that securities
> fraud plaintiffs can in certain circumstances satisfy the reliance
> element of a Rule 10b–5 action by invoking a rebuttable
> presumption of reliance, rather than proving direct reliance on a
> misrepresentation. The Court based that presumption on what is
> known as the "fraud-on-the-market" theory, which holds that "the
> market price of shares traded on well-developed markets reflects
> all publicly available information, and, hence, any material
> misrepresentations." *Id.* at 246. The Court also noted that, rather
> than scrutinize every piece of public information about a company
> for himself, the typical "investor who buys or sells stock at the
> price set by the market does so in reliance on the integrity of that
> price"—the belief that it reflects all public, material information.
> *Id.* at 247. As a result, whenever the investor buys or sells stock at
> the market price, his "reliance on any public material
> misrepresentations . . . may be presumed for purposes of a Rule
> 10b-5 action." *Ibid*.
>
> Based on this theory, a plaintiff must make the following showings
> to demonstrate that the presumption of reliance applies in a given
> case: (1) that the alleged misrepresentations were publicly known,
> (2) that they were material, (3) that the stock traded in an efficient
> market, and (4) that the plaintiff traded the stock between the time
> the misrepresentations were made and when the truth was revealed.

*Halliburton*, 134 S. Ct. at 2408.

The core of Defendants' argument on reliance appears to be that the alleged

misrepresentations and omissions in this case were not material because they were not about

Galena's core business operations. For an omission to be material, "'there must be a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having significantly altered the 'total mix' of information made available.'" *Petrie v.*

*Elec. Game Card, Inc.*, 761 F.3d 959, 970 (9th Cir. 2014) (quoting *S.E.C. v. Todd*, 642

F.3d 1207, 1215 (9th Cir. 2011)). "[A] statement is material if there is a substantial likelihood

that a reasonable investor would consider it important in making a decision." *United States v.*

*Tarallo*, 380 F.3d 1174, 1182 (9th Cir. 2004).

For the alleged misrepresentations and omissions the Court has found to be actionable,

the Court also finds that they are material. There is a substantial likelihood that a reasonable

investor would have found the fact that Galena's Prospectus and SEC filings did not disclose that

the Company and its officers were engaging in fraud or market manipulation to have

significantly altered the "total mix" of information. Similarly there is a substantial likelihood that

a reasonable investor would have found the fact that the numerous articles touting Galena were

sometimes authored by the same persons using different aliases, that the authors used false

credentials, and that the authors were paid to tout Galena to alter the total mix of information.

*See, e.g.*, *Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 237 (D. Mass. 2004)

(holding that the allegation that a stock analyst failed to disclose that his positive rating was the

result of a *quid pro quo* agreement with the rated company was a material misrepresentation or

omission); *Cyber Media Grp., Inc. v. Island Mortgage Network, Inc.*, 183 F. Supp. 2d 559, 572-

73 (E.D.N.Y. 2002) (finding that allegations that a stock analyst's statement  that a company was

a "double your money stock" without disclosing the analyst's conflict of interest were sufficient

to plead materiality).

### d.  Loss causation

The Ninth Circuit has discussed the pleading requirements for loss causation as follows:

> Broadly speaking, loss causation refers to the causal relationship
> between a material misrepresentation and the economic
> loss suffered by an investor. [*Dura Pharm., Inc. v. Broudo*, 544 U.S.
> 336, 342 (2005)]. Ultimately, a securities fraud plaintiff must
> prove that the defendant's misrepresentation was a "substantial

> cause" of his or her financial loss. *In re Daou Sys., Inc.*, 411 F.3d
> 1006, 1025 (9th Cir. 2005). At the pleading stage, however, the
> plaintiff need only allege that the decline in the defendant's stock
> price was proximately caused by a revelation of fraudulent activity
> rather than by changing market conditions, changing investor
> expectations, or other unrelated factors. *Metzler Inv. GMBH v.
> Corinthian Colls., Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008). In
> other words, the plaintiff must plausibly allege that the defendant's
> fraud was "*revealed* to the market and *caused* the resulting losses."
> *Id.* at 1063 (emphasis added).

*Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) (emphasis in original); *see also*

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1119 (9th

Cir. 2013) ("Typically, to satisfy the loss causation requirement, the plaintiff must show that the

revelation of that misrepresentation or omission was a substantial factor in causing a decline in

the security's price, thus creating an actual economic loss for the plaintiff.") (quotation marks

omitted).

Defendants argue that Plaintiffs do not properly to plead loss causation because, as pled

by Plaintiffs, the information disclosed in the alleged corrective disclosures was "already

publicly available on the internet" and thus was not new information to the market. Specifically,

Defendants argue that Plaintiffs' allegations relating Mr. Matt Gravitt's February 1, 2014 article

"Paying Companies for Stock Promotion and Significant Insider Selling are Major Red Flags" is

fatal to Plaintiffs' claims.

As alleged by Plaintiffs, Mr. Gravitt published an article on *Seeking Alpha* in which

Mr. Gravitt informs the public that he is suspicious of stocks that are heavily touted on the

internet and he researched Galena's heavy internet promotion. Mr. Gravitt visited the website

www.stockpromoters.com and typed in "GALE"[37] and noted that there were 27 different

instances of Galena being promoted since March 2012. Mr. Gravitt then found a disclaimer on

---

[37] GALE is Galena's stock symbol.

"the tip-us websitem"[38] disclosing that MissionIR received compensation from Galena for promotional services. The day after Mr. Gravitt's article was published, Galena's stock price fell by approximately 20 percent on heavy volume. Plaintiffs allege several other disclosures, on February 12, 13, 14 and March 13, 2014, all exposing further details of the alleged scheme and all resulting in Galena's stock price falling.

At this stage of the proceedings, the Court finds that the fact that Mr. Gravitt was able to track down a short disclaimer about MissionIR receiving compensation from Galena in an allegedly obscure website after researching Galena's promotions does not demonstrate that the information regarding Galena's stock promotions was already in the market and incorporated into Galena's stock price. There is no allegation that the published articles linked to or otherwise referenced the "tip-us" disclaimer or disclosed any relationship between Galena and MissionIR or DreamTeam.

The DreamTeam Defendants argue that the disclaimer placed on DreamTeam's website that MissionIR received compensation from Galena served to incorporate that information into the market. This argument is unavailing. Persons reading the many published articles about Galena had no way of knowing that those specific materials were connected to DreamTeam or MissionIR, and thus would have had no reason to check DreamTeam's website for any disclaimer relating to Galena or MissionIR. Moreover, Plaintiffs allege that the authors posted false biographies that did not disclose the author's connection to either DreamTeam or MissionIR.

The limited disclaimers on "tip-us" or DreamTeam's website demonstrate the importance of the requirement that paid promoters disclose the paid relationship within the publication itself.

---

[38] The excerpted article does not provide the URL for "the tip-us website" or explain how Mr. Gravitt knew about the website or visited the website.

It is not reasonable for investors to have to research every stock promotion-related website to make sure that each company recommended by purportedly independent analysts and investors has not hired a promotional firm to engage in secret stock promotions.

The fact that the paid promotional campaign is information that was not incorporated into Galena's stock price is further evidenced by Plaintiffs' allegations that after Mr. Gravitt's February 1, 2014 article was published Galena's stock price dropped 20 percent, and after Mr. Feuerstein's February 12, 2014 article was published Galena's stock price dropped more than 16 percent. Plaintiffs allege that as the disclosures continued, Galena's stock price continued to fall. After the February 13 and 14 articles, Galena's stock price fell 14 percent. After the March 13, 2014 article, Galena's stock price dropped more than seven percent. If the fact of the promotional scheme was already incorporated into the market price, then these disclosures would not have had such a significant impact on Galena's stock price.

Although Defendants may provide evidence at summary judgment or trial that the alleged misrepresentations did not substantially cause Plaintiffs' losses, at this stage the Court finds that Plaintiffs adequately have alleged that the alleged fraud was revealed to the market through several disclosures in February and March 2014 and caused Galena's stock price to drop significantly. *Cf. W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950, 983 (D. Minn. 2014) (rejecting argument that disclosure of drug's side effects on Federal Drug Administration website was sufficient to preclude allegations of loss causation because it was not appropriate at the pleading stage for the court to investigate and compare the disclosures with the findings of the allegedly misleading studies and articles that downplayed the drug's side effects, and then determine whether investors would have relied on the studies and not cross-checked against the website disclosures).

PAGE 63 – OPINION AND ORDER

### e.  "In connection with" the purchase or sale of a security

The DreamTeam Defendants also argue that the alleged misstatements and omissions in the articles published through Galena's relationship with DreamTeam were not "in connection with" the purchase or sale of security. The DreamTeam Defendants argue that is because the only alleged misrepresentations and omissions are that the authors used falsely credentialed aliases and failed to disclose they were being paid to tout Galena. The DreamTeam Defendants' reading of the "in connection with" requirement is too narrow.

As noted above, alleged misrepresentations are sufficiently connected and actionable if they touch upon or have some nexus with any securities transaction. *Rana Research*, 8 F.3d at 1362. "Where the fraud alleged involves public dissemination in a document such as a press release, annual report, investment prospectus *or other such document on which an investor would presumably rely*, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission." *Id.* (emphasis added). The articles here were publicly disseminated, and the Court has already found that the alleged misrepresentations and omissions are material. The Court further finds that articles touting Galena published by purportedly experienced investors on highly-regarded investment websites are documents on which an investor presumably would rely. This is demonstrated by the increase in the price of Galena stock that allegedly occurred after the articles were published. The published articles are also documents intended to influence the investing public. Indeed, that was the whole point in publishing them—to raise Galena's stock price. Accordingly, Plaintiffs sufficiently allege that the articles were "in connection with" the purchase or sale of a security. *Cf. S.E.C. v. Trabulse*, 526 F. Supp. 2d 1001, 1006 (N.D. Cal. 2007) (finding, among others, that newsletters that summarized the relevant mutual fund's performance, current market conditions,

and what the markets were expected to do in the future were sufficiently connected with the purchase or sale of a security).

### f. Conclusion

Plaintiffs sufficiently allege violations of Rule 10b-5(b) as follows: (1) against Ahn, Bernarda, and Galena for the allegedly false and misleading articles published through Galena's relationship with DreamTeam; (2) against Ahn and Galena for statements contained in the Underwriting Agreement contained in Galena's September 13, 2013 8-K filing and in Galena's 2013 third quarter 10-Q/A; and (3) against Galena for the statements contained in the September 13, 2013 prospectus.

### 2. Rule 10b-5(a) and (c)

Rule 10b-5(a) prohibits persons from employing "any device, scheme, or artifice to defraud" and Rule 10b-5(c) prohibits persons from engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."[39] Claims under Rule 10b5-(a) and (c) are generally referred to as claims for "scheme liability." Scheme liability claims are distinct from claims under Rule 10b-5(b). Rule 10b-5(b) claims are based solely on deceptive statements or omissions, whereas scheme liability claims involve deceptive conduct, which may include deceptive statements or omissions but must also include additional conduct. *Spot Runner*, 655 F.3d at 1057 ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions.");[40] *S.E.C. v. Loomis*, 969

---

[39] As discussed above, the Court finds that the Consolidated Complaint provides adequate notice that Plaintiffs are asserting scheme claims under Rule 10b-5(a) and (c).

[40] The Court notes that the Ninth Circuit's interpretation that claims under Rule 10b-5(a) and (c) require conduct in addition to alleged misrepresentations and omissions has recently been expressly considered and rejected by the Securities Exchange Commission in formal

F. Supp. 2d 1226, 1237 (E.D. Cal. 2013) ("Yet, the same set of facts may give rise both to a violation of subsection (b) and subsections (a) and/or (c) if plaintiff alleges 'that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations.'" (quoting *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005))).

To allege a claim for scheme liability, a plaintiff must allege the elements of a securities fraud claim. *Stoneridge Invs. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 158 (2008). Rules 10b-5(a) and (c), however, prohibit manipulative or deceptive acts, versus material misrepresentations or omissions. Thus, to state a claim for securities fraud based on scheme liability, a plaintiff must allege: (1) the defendant committed a deceptive or manipulative act in furtherance of the alleged scheme; (2) scienter; (3) a connection between the alleged deceptive or manipulative act and the purchase or sale of a security; (4) reliance upon the alleged deceptive or manipulative act; (5) economic loss; and (6) loss causation. *See Halliburton*, 134 S. Ct. at 2407; *Stoneridge*, 552 U.S. at 158. Further, a defendant may not be held liable for aiding and abetting an alleged scheme—each defendant must be primarily liable under the securities laws and engage in his or her own deceptive conduct. *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, (1994); *see also Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997) ("*Central Bank* does not preclude liability based on allegations that a group of defendants acted together to violate the securities laws, as long as each defendant committed a manipulative or deceptive act in furtherance of the scheme.").

The reliance presumptions accepted by the Supreme Court also apply to scheme liability claims. *Stoneridge*, 552 U.S. at 159. These presumptions are: (1) if there is a material omission

---

adjudication. *In re Flannery*, SEC Release No. 3981, 2014 WL 7145625 (Dec. 15, 2014). The Court need not, however, determine the effect, if any, of *In re Flannery* in this case because the Court finds that Plaintiffs sufficiently allege conduct in addition to the alleged misrepresentations and omissions.

by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance; and (2) the fraud-on-the-market doctrine, which presumes reliance when the statements at issue become public. *Id.* Because the fraud-on-the-market presumption is applicable when the alleged scheme involves misleading public statements or manipulative or deceptive conduct that is publicly known and affects the market, courts describe the elements for scheme liability in such cases as: (1) the plaintiff was injured (2) in connection with the purchase or sale of securities (3) by relying on an assumption of an efficient market free of manipulation (4) where the defendant committed a deceptive or manipulative act (5) with scienter (6) that controlled or artificially affected the securities market. *See ATSI Commus., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101 (2d Cir. 2007); *Medtronic*, 57 F. Supp. 3d at 977; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 580 (S.D. Tex. 2002).

Although not subject to the PSLRA pleading requirements, the conduct underlying claims for scheme liability must be alleged with particularity under Rule 9(b). *ATSI*, 493 F.3d at 101; *Medronic*, 57 F. Supp. 3d at 966. Because "the exact mechanism of the scheme is likely to be unknown to the plaintiffs, allegations of the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants are sufficient for alleging participation." *In re Enron*, 235 F. Supp. 2d at 580; *see also ATSI*, 493 F.3d at 102 ("A claim of manipulation, however, can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim. Accordingly, a manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants."); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 493 (S.D.N.Y. 2005) ("A plaintiff alleging market manipulation in violation of Rule 10b–5(a) and (c) must specify what manipulative acts were

performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." (quotation marks omitted)).

Defendants argue that Plaintiffs do not adequately plead a claim of scheme liability because Plaintiffs do not allege conduct beyond the alleged misrepresentations and omissions, do not allege actionable manipulative conduct, allege only aiding and abetting liability, do not properly allege reliance, and do not properly allege scienter. The Court has already resolved the issue of scienter and now analyzes Defendants' remaining arguments.[41]

### a.  Conduct in addition to the alleged misrepresentations and omissions

Defendants argue that Plaintiffs merely recast their misrepresentation claim under Rule 10b-5(b) as a scheme liability claim under Rules 10b-5(a) and (c). Specifically, Defendants assert that Plaintiffs' scheme liability claim is based entirely on the same conduct as their misrepresentation claim. The Court disagrees. Although the alleged scheme involves allegedly false and misleading statements in some of Galena's publicly-filed documents and in published articles, Plaintiffs also allege additional conduct. This additional conduct includes Defendants' *actions* in allegedly manipulating the stock price, including Galena hiring Lidingo and DreamTeam, Galena paying them both significantly above-market rates, Lidingo and DreamTeam hiring authors to publish the articles and other promotional materials, Ahn paying Lidingo in stock options in violation of Company policy, Ahn and Dunlap concealing the fact that Ahn paid Lidingo stock options in violation of Company policy, Ahn and Bernarda reviewing, editing, and approving the articles, the planning and execution of well-timed social media posts and emails with targeted content to artificially inflate the value of Galena's stock, the sale of significant personally-held Galena stock by insiders at artificially inflated prices, the

---

[41] The Court has also already found that Plaintiffs sufficiently allege loss causation and that the alleged scheme was "in connection with" the purchase or sale of securities.

attempted cover-up of those stock sales, and the attempted cover-up of the full relationship

between Galena and DreamTeam and Lidingo. This conduct is separate from the alleged

misrepresentations and omissions and is sufficient to allege a claim for scheme liability. *See,*

*e.g.*, *Medtronic*, 57 F. Supp. 3d at 977, 981-82 (allowing a scheme liability claim where the

alleged conduct was that Medtronic designed clinical trials in a manner that elicited biased

results and Medtronic personnel edited journal articles published by physician consultants and

failed to disclose that Medtronic paid the consultants millions of dollars during the drafting

process); *JAC Holding Eters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 735

(E.D. Mich. 2014) (allowing a scheme liability claim where the alleged conduct was "not just

specific false statements . . . but also the planning and carrying out of a comprehensive scheme,

by specific steps, to mislead the buyers as to JAC's value . . . ."); *S.E.C. v. Curshen*, 888 F.

Supp. 2d 1299, 1308 (S.D. Fla. 2012) (finding allegations that one defendant "orchestrated the

false media campaign" surrounding the company, which included "arranging for the posting of a

false website" touting company developments and issuing press releases claiming fictitious

achievements sufficient to allege scheme liability); *Swack*, 383 F. Supp. 2d at 239 ("[The

plaintiff] has alleged not just that Wolfenberger issued one or two misleading research reports,

but rather that over time he worked extensively with Dachis to issue bullish research reports (and

'work' Razorfish stock in conference calls and elsewhere) with the deliberate aim of boosting

Razorfish's market price artificially. This adequately states a 'scheme' and 'course of business'

under Rule 10b-5(a) and (c)."); *In re ZZZZ Best Sec. Litig.*, 864 F. Supp. 960, 971-72 (C.D.

Cal. 1994) (finding allegations that a defendant reviewed, edited, and approved press releases

and other allegedly misleading documents that did not themselves constitute a violation of

Rule 10b-5(b) but were part of an alleged scheme sufficient to support scheme liability); *see also*

*In re CytRx*, Dkt. 148-1 at 17 (finding allegations nearly identical to those in this case sufficient to support a scheme liability claim against CytRx, certain of its officers and directors (including Kriegsman), and Meyer).

The fact that some of these alleged acts are closely connected to the alleged misrepresentations and omissions or that the alleged conduct was not disclosed until the alleged scheme unraveled does not mean that Plaintiffs' scheme liability claim is a mere recast of their misrepresentation claim. As explained by the Ninth Circuit:

> Manipulative conduct, by contrast, is actionable under Rule 10b–5(a) or (c) and includes activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand. *See Santa Fe*, 430 U.S. at 476–77, 97 S.Ct. 1292; *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) ("[Manipulation] connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."). In order to succeed, manipulative schemes must usually remain undisclosed to the general public. *See Santa Fe*, 430 U.S. at 477, 97 S.Ct. 1292. If such nondisclosure of a defendant's fraud was an actionable omission, then every manipulative conduct case would become an omissions case. If that were so, then all of the Supreme Court's discussion of what constitutes manipulative activity would be redundant. We decline to read the Supreme Court's case law on manipulative conduct as little more than an entertaining, but completely superfluous, intellectual exercise. *See Stoneridge*, 128 S.Ct. at 769 (listing the three types of § 10(b) actions); *Cent. Bank*, 511 U.S. at 177, 114 S.Ct. 1439 (same).

*Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940-41 (9th Cir. 2009).

Here, a significant portion of the conduct alleged is not independently actionable misrepresentations or omissions, but is instead part of an alleged scheme artificially to inflate Galena's stock price. The Court finds that Plaintiffs sufficiently allege conduct beyond the alleged misrepresentations and omissions.

### b. Actionable conduct

Defendants also argue that the type of conduct alleged in this case is not considered "manipulative" conduct under securities law and thus is not actionable. Relying on *Santa Fe*, Defendants argue that "manipulative" conduct is a term of art and means market transactions such as "wash sales, matched orders, or rigged prices." *Santa Fe*, however, noted that two types of conduct are actionable under Rules 10b-5(a) and (c)—"deceptive" and "manipulative." The court in *Santa Fe* found there was no element of deception in the alleged breach of fiduciary duty in that case and therefore only discussed "manipulative" conduct. Here, the alleged conduct is "deceptive" and so falls within that category of actionable conduct. *See In re ZZZZ Best*, 864 F. Supp. at 971 (finding that although no "*manipulative*" conduct was alleged, the "scope of *deceptive* devices or schemes prohibited by subsections (a) and (c) is quite extensive") (emphasis added).

Further, "manipulative" conduct is not as narrow as Defendants argue. In discussing "manipulative" conduct, the Ninth Circuit has held:

> It is also readily apparent that the conduct alleged in the complaint was not 'manipulative' within the meaning of the statute. 'Manipulation' is "virtually a term of art when used in connection with securities markets." The term refers *generally* to practices, *such as* wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity. Indeed, nondisclosure is usually essential to the success of a manipulative scheme. No doubt Congress meant to prohibit the *full range* of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' if it had meant to bring within the scope of s 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.

*Santa Fe*, 430 U.S. at 476-77 (emphasis added) (citations omitted). This broad language supports the conclusion that manipulative conduct includes more than only wash sales, matched orders, or

rigged prices. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 386 (1983) ("In furtherance

of that objective, § 10(b) makes it unlawful to use '*any* manipulative or deceptive device or

contrivance' in connection with the purchase or sale of any security." (emphasis in original));

*Superintendent of Ins. v. Bankers Life and Cas. Co.*, 404 U.S. 6, 11 n.7 (1971) ("'We believe that

Section 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or

sale of securities whether the artifices employed involved a garden type variety of fraud, or

present a unique form of deception. Novel or atypical methods should not provide immunity

from the securities laws.'" (emphasis in original) (quoting *A. T. Brod & Co. v. Perlow*, 375 F.2d

393, 397 (2d Cir. 1967))); *In re ZZZZ Best*, 864 F. Supp. at 971 ("Thus, the terms of the statute

and rule extend liability to *all* participants in *any* scheme or device that operates as a fraud on

investors." (emphasis in original)). Such an interpretation comports with the Supreme Court's

directive to construe the Exchange Act "'not technically and restrictively, but flexibly to

effectuate its remedial purposes.'" *Zandford*, 535 U.S. at 819 (quoting *Affiliated Ute*, 406 U.S.

at 151).

Regardless of whether the alleged conduct is considered "manipulative" or "deceptive,"

Section 10(b) and Rule 10b-5(a) and (c) have been interpreted to prohibit a wide variety of

conduct. *See, e.g.*, *Swack*, 383 F. Supp. 2d at 238 (noting that the "conduct necessary to form a

Rule 10b-5(a) or (c) violation can vary widely" and giving as an example promulgating

deceptively favorable research reports); *In re Enron*, 235 F. Supp. 2d at 579 ("Market

manipulation, employment of a manipulative device, and engaging in manipulative schemes such

as a scheme to artificially inflate or deflate stock prices, falsifying records to reflect non-existent

profits, and creating and distributing false research reports favorably reviewing a company are

other types of conduct prohibited by § 10(b) and Rule 10b–5 that do not fall within the category

of misleading statements and omissions."); Thomas Lee Hazen, TREATISE ON THE LAW OF

SECURITIES REGULATION, Vol. 3, § 12.1 (Sixth ed. 2009) ("[S]ubjective intent combined with

deceptive conduct can establish market manipulation."). Such conduct includes "pump and

dump" promotional schemes similar to what Plaintiffs allege in this case. *See, e.g.*, *U.S. v.

Curshen*, 567 F. App'x 815, 816 (11th Cir. 2014) ("A pump and dump scheme involves

artificially inflating the price and volume of an owned stock—by promotional or trading

activity—to sell the stock at a higher price. Once the overvalued shares are dumped, the price

and volume of shares plummet and unsuspecting investors lose their money. . . . [Defendants]

and their co-conspirators perpetrated their pump-and-dump stock manipulation scheme by

issuing false and misleading press releases and other promotional materials and by coordinating

the trading activities of [company] stock sellers and buyers."); *Curshen*, 888 F. Supp. 2d at 1307

(noting that a "pump-and-dump stock scheme is a classic violation" of Rules 10b-5(a) and (c));

*Cf. U.S. v. Zolp*, 479 F.3d 715, 717 n.1 (9th Cir. 2007) ("'Pump and dump' schemes 'involve the

touting of a company's stock (typically microcap companies) through false and misleading

statements to the marketplace. After pumping the stock, fraudsters make huge profits by selling

their cheap stock into the market.'" (quoting U.S. Securities and Exchange Commission, Fast

Answers: Pump and Dump, at http://www.sec.gov/answers/pumpdump.htm., also citing Hazen,

Law of Securities Regulation, §§ 2.2 n. 80, 14.18 (5th ed. 2005))). The Court finds that Plaintiffs

sufficiently allege actionable manipulative or deceptive conduct.

### c.   Primary violation versus aiding and abetting

Defendants argue that Plaintiffs' allegations are, at most, that various Defendants aided

and abetted the primary violations of other alleged primary violators. This argument is

unavailing.

Scheme liability is not contingent upon the defendant making a specific misrepresentation or public statement. *See Stoneridge*, 552 U.S. at 158 (holding that there need not be a specific oral or written statement before Section 10(b) or Rule 10b-5 liability may apply). Moreover, the issue of who is a "maker" of any particular false or misleading statement is not relevant in a claim of scheme liability. *See S.E.C. v. Monterosso*, 756 F.3d 1326, 1334 (11th Cir. 2014) (holding that where a defendant is alleged to have made deceptive contributions to an overall fraudulent scheme, *Janus* and the issue of who is a "maker" has no bearing). Instead, the Court considers whether each Defendant against whom Claim One is asserted "committed a manipulative or deceptive act in furtherance of the scheme." *Cooper*, 137 F.3d at 624; *see also In re Enron*, 235 F. Supp. 2d at 592 ("Thus secondary actors may be liable for primary violations under an alleged scheme to defraud if all the requirements for liability under Rule 10b–5 have been satisfied as to each secondary-actor defendant and any additional heightened pleading requirements have been met. If a plaintiff meets the requirements of pleading primary liability as to each defendant, *i.e.*, alleges with factual specificity (1) that each defendant made a material misstatement (or omission) or committed a manipulative or deceptive act in furtherance of the alleged scheme to defraud, (2) scienter, and (3) reliance, that plaintiff can plead a scheme to defraud and still satisfy *Central Bank*." (citation omitted)). A defendant may be liable under a scheme claim even if that defendant is merely following orders or the scheme is masterminded by someone else. *See S.E.C. v. U.S. Envtl., Inc.*, 155 F.3d 107, 112 (2d Cir. 1998) ("Like lawyers, accountants, and banks who engage in fraudulent or deceptive practices at their clients' direction, Romano is a primary violator despite the fact that someone else directed the market manipulation scheme. The Supreme Court in *Central Bank* never intended to restrict § 10(b)

liability to supervisors or directors of securities fraud schemes while excluding from liability subordinates who also violated the securities law.").

For the reasons discussed throughout this Opinion and Order, the Court finds that Plaintiffs sufficiently allege that Bernarda, Ahn, Galena, Bjorlin, Lidingo, DreamTeam, McCarthy, and Meyer each committed at least one specified manipulative or deceptive act in furtherance of the alleged scheme. Plaintiffs sufficiently allege the nature, purpose, and effect of the alleged scheme and the roles of each of these defendants in the scheme. *ATSI*, 493 F.3d at 102; *In re Enron*, 235 F. Supp. 2d at 580. With respect to Dunlap, although Plaintiffs do not sufficiently allege his scienter (as discussed above), Plaintiffs do sufficiently allege that he committed a manipulative or deceptive act in furtherance of the alleged scheme. Dunlap's alleged knowledge of and failure to disclose the improper stock options payment to Lidingo and his participation in the attempts to hide the insider stock sales are acts in furtherance of the alleged scheme.

### d. Reliance

Defendants argue that Plaintiffs' scheme claim is foreclosed by the Supreme Court's decision in *Stoneridge* because Plaintiffs cannot prove the element of reliance. The reliance concern present in *Stoneridge*, however, does not arise in this case.

*Stoneridge* involved claims against vendors of Charter Communications. These vendors allegedly overcharged Charter for set-top boxes and then returned the overpayment by purchasing advertising from Charter. 552 U.S. at 154. Charter, in turn, recorded the advertising purchases as revenue and capitalized the set-top box expenses, in violation of generally accepted accounting principles. *Id.* Charter's allegedly false and misleading financial statements were then publicly-filed. *Id.* at 155. The vendors had no role in preparing or disseminating Charter's financial statements. *Id.*

PAGE 75 – OPINION AND ORDER

In *Stoneridge* the Supreme Court held that that the fraud-on-the-market theory of reliance applies to claims of scheme liability, but the court did not apply the presumption in that case because the conduct of the vendors was never disclosed to the market and thus did not affect market prices. *Id.* at 159. The Supreme Court then analyzed whether the plaintiffs sufficiently alleged direct reliance and held that the plaintiffs could not prove they relied on the conduct of the vendors because the allegedly deceptive acts of the vendors were "in an indirect chain that we find too remote for liability" and that nothing the vendors did "made it necessary or inevitable for Charter to record the transactions as it did." *Id.* at 159, 161. Critical to the Supreme Court's analysis in *Stoneridge* was the fact that the only information given to the public was the financial statement prepared by Charter, and the vendors' conduct was only related to the underlying business transactions that the financial statement reflected. *Id.* at 161. The Supreme Court held that interpreting the fraud-on-the-market theory to include reliance not only on public statements but on every business transaction behind every public statement would extend the implied private right of action to the "whole marketplace." *Id.*

The Court has already found that Plaintiffs sufficiently alleged fraud-on-the-market reliance based on the alleged misrepresentations and omissions. The Court now must consider whether the conduct of each defendant against whom Claim One is asserted is sufficiently connected to the information released to the public to warrant reliance being presumed based on *that defendant's* own alleged conduct. *Id.* at 160.

The allegations in this case are distinguishable from those in *Stoneridge*. Each of the Defendants against whom Claim One is asserted is alleged to have directly engaged in conduct that resulted in allegedly misleading information being disseminated to the public and artificially inflating Galena's stock price. DreamTeam, McCarthy, Meyer, Bjorlin, and Lidingo are alleged

to have played essential roles in disseminating the alleged promotional scheme to the public. They are alleged to have hired authors to draft articles and other promotional materials, sent or caused to be sent promotional emails, and posted or caused to be posted information on social media designed to tout Galena, inflate Galena's stock price, or call attention to other aspects of the alleged promotional scheme. In the case of Meyer, he is alleged to have drafted some of the allegedly false and misleading articles. This is direct conduct that is alleged to have artificially inflated the price of Galena's shares. Additionally, although Galena, Ahn, and Bernarda approved the articles, DreamTeam, McCarthy, and Meyer played a critical role in getting the articles drafted and published by coordinating with authors, websites, and Galena. This is unlike the vendors in *Stoneridge*, who played no role in drafting or publishing Charter's financial statements. DreamTeam, McCarthy, Lidingo, and Bjorlin also allegedly marketed themselves as having strong relationships with key investor websites such as *Seeking Alpha* that enabled them to get articles published on those websites. Without them serving as intermediaries between Galena, authors, and investor websites, the articles likely would not have been published. These actions are not part of an indirect chain too remote for liability, but are direct actions that caused certain false or misleading information to be publicly disseminated into the marketplace and, as alleged by Plaintiffs, artificially inflate Galena's stock price.

Similarly, Ahn, Bernarda, and Galena did not play a remote, attenuated role in disseminating allegedly false and misleading information to the public. They hired the promotional firms. They caused the articles to be published, and Ahn and Galena caused public statements to be published in certain publicly-filed documents.

The alleged conduct of all defendants against whom Claim One is asserted had a direct connection to public statements—some of which were allegedly false and misleading and some

of which were not, but were made in furtherance of the alleged scheme. Additionally, these Defendants are alleged to have engaged in specific actions to cover-up Galena's relationship with the promotional firms, to publicly disseminate information about Galena, and to create a "host of voices" about Galena designed artificially to inflate Galena's stock price.

These actions, unlike the generally unknown actions of the vendors in *Stoneridge*, are alleged to have artificially affected the securities market, when Plaintiffs relied on an assumption of an efficient market free of manipulation. The plaintiffs in *Stoneridge* alleged that the vendors were part of a behind-the-scenes scheme. Here, to the contrary, Plaintiffs allege a scheme that, by its nature, was intended to, and allegedly did, mislead the public regarding the value of and interest in Galena's stock in order to inflate Galena's stock price. This is distinguishable from *Stoneridge* and Plaintiffs properly rely on the fraud-on-the-market theory of reliance for their scheme liability claims. *See, e.g.*, *Medtronic*, 57 F. Supp. 3d at 981 (noting that *Stoneridge* observed that conduct, without connection to a public statement by the involved defendant, was found not entitled to a presumption of reliance under the fraud-on-the-market theory, and further noting that "[i]t is not clear, nor do Defendants explain, how this observation applies to the allegations here, where Plaintiffs have alleged that Defendants' conduct—manipulating INFUSE clinical studies to overstate its efficacy and understate its risks—itself misled investors by inflating confidence in INFUSE and its sales" and finding that the plaintiffs could rely on the fraud-on-the-market presumption of reliance).

### e.  Conclusion

Plaintiffs adequately allege scheme liability against Ahn, Bernarda, Galena, Bjorlin, Lidingo, Meyer, McCarthy, and DreamTeam. Plaintiffs do not adequately allege scheme liability against Dunlap because they do not sufficiently allege Dunlap's scienter.

PAGE 78 – OPINION AND ORDER

**E.  Claim Two: Control Person Liability under Section 20(a)**

Plaintiffs claim that all Defendants except DreamTeam are secondarily liable for DreamTeam and Galena's alleged Rule 10b-5 violations because Defendants were "controlling persons" of Galena or DreamTeam under Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a). The Court has found that Plaintiffs sufficiently allege a primary securities law violation by both Galena and DreamTeam. Thus, the Court considers whether Plaintiffs sufficiently allege that any Defendant (except DreamTeam) is a control person of Galena or DreamTeam.

**1.  Standards**

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under . . . this chapter . . . shall also be liable . . . to the same extent as such controlled person." 15 U.S.C. § 78t(a). For control-person liability, a plaintiff must allege: "(1) a primary violation of federal securities laws," and "(2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "The plaintiff need not show the controlling person's scienter or that they 'culpably participated' in the alleged wrongdoing." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996).

"Control" is defined by the SEC as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. 230.405; *see also Howard*, 228 F.3d at 1065 n.9 (accepting the SEC's definition of control). Whether an individual defendant is a "controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power

to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994) (citations omitted).

Allegations of day-to-day oversight of a company's operations and involvement in the statements at issue have been found sufficient to presume control over the transactions giving rise to alleged securities violations by that company. *See Howard*, 228 F.3d at 1065-66 (finding "actual authority over the preparation and presentation to the public of the financial statements" at issue sufficient to make out a *prima facie* case); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987) (noting that although the directors' status alone was insufficient for a finding of control, their day-to-day oversight of company operations and involvement in the financial statements at issue were sufficient to presume control over the "transactions giving rise to the alleged securities violation"); *cf. In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *19 (N.D. Cal. Apr. 2, 2002) (finding allegations that the defendants "held the highest offices in the corporation, spoke frequently on its behalf, and made key decisions in how to present its financial results" sufficient to allege control person liability). "Although a person's being an officer or director does not create any *presumption* of control, it is a sort of red light." *Paracor*, 96 F.3d at 1163 (citations omitted) (emphasis in original).

It is also sufficient to allege control over the "mechanisms intended to prevent" the fraud and failure to prevent it. *See Fouad v. Isilon Sys., Inc.*, 2008 WL 5412397, at *12 (W.D. Wash. Dec. 29, 2008). Under this standard, for example, "an officer or director who has signed financial statements containing materially false or misleading statements qualifies as a control person." *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1037 (C.D. Cal. 2008) (collecting cases); *see also In re Montage Tech. Grp. Ltd. Sec. Litig.*, --- F. Supp. 3d ---, 2015 WL 392669, at *9 (N.D. Cal. Jan. 29, 2015) (similar). Similarly, allegations of membership in a committee whose

responsibilities "relate[] directly to the subject of [the] fraud allegations" are sufficient to plead control-person liability. *Fouad*, 2008 WL 5412397, at *12; *see also In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 509 (W.D. Wash. 2009) (denying a motion to dismiss on control-person liability because the plaintiffs were able to "affirmatively link board membership to [the defendant's] primary violations").

### 2. Control by Lidingo Defendants

Plaintiffs do not sufficiently allege that either Bjorlin or Lidingo have the requisite control over either Galena or DreamTeam. Plaintiffs allege no facts that Bjorlin or Lidingo were involved in the day-to-day operations or the promotional and marketing decisions of DreamTeam or Galena. Accordingly, Plaintiffs' control person claims against Bjorlin and Lidingo are dismissed.

### 3. Control by Galena's Management and Outside Directors

Plaintiffs sufficiently allege that Ahn, Bernarda, and Dunlap had the requisite control over Galena and the transactions at issue to assert control person liability. Plaintiffs allege that Ahn was the president, CEO, and a director during the class period; was involved in hiring, paying, and firing DreamTeam and Lidingo; monitored DreamTeam and Lidingo's work on behalf of Galena; spoke on behalf of the company; reviewed, edited, and approved the allegedly false and misleading articles; and signed allegedly false and misleading documents filed with the SEC. Accordingly, Plaintiffs sufficiently allege that Ahn had authority both over the management and policies of Galena and over the primary violations of both the allegedly false and misleading statements and the alleged scheme.

Plaintiffs allege that Bernarda was Galena's vice president of marketing and communications and is responsible for Galena's investor and public relations; was involved in hiring DreamTeam and other promotional firms; monitored DreamTeam's work; and reviewed,

edited, and approved the allegedly false and misleading articles. Accordingly, Plaintiffs sufficiently allege that Bernarda had authority both over the management and policies of Galena with respect to its investor and public relations and over the primary violations of both the allegedly false and misleading articles and the alleged scheme.

Plaintiffs allege that Dunlap was Galena's CFO and vice president; drafted and modified Galena's insider-trading policy; had authority over certain insiders' requests to sell shares during the class period; and signed certain allegedly false SEC filings. That is sufficient involvement in the day-to-day business of Galena and authority over its management and policies to state a *prima facie* claim that Dunlap controlled Galena for purposes of the alleged scheme and the false statements contained within the SEC filing signed by Dunlap.[42]

Plaintiffs do not, however, sufficiently allege control by Schwartz. Plaintiffs only allege that he was Galena's Chief Operating Officer and Executive Vice President and sold some of his shares. Plaintiffs make no other allegations sufficient to show that Schwartz had the requisite control over Galena's day-to-day operations, Galena's management and policies, Galena's investor and public relations, or the articles or SEC filings at issue. Accordingly, Plaintiffs' control person liability claim against Schwartz is dismissed.

Similarly, Plaintiffs do not sufficiently allege that any of the Outside Directors had the requisite control over Galena or its public and investor relations. Plaintiffs allege that the Outside Directors were directors of Galena and that some of them were members of Galena's Compensation Committee that issued a suspicious award of stock options during the alleged promotional scheme. The fact that certain directors were members of the Compensation Committee, without more, does not suffice to allege that those directors were control persons.

---

[42] Because scienter is not required to allege a claim under Section 20(a), Plaintiffs' control person claim against Dunlap survives.

The Compensation Committee did not oversee Galena's promotional efforts or review Galena's relationship with Lidingo or DreamTeam. Thus, membership in this committee is unlike cases involving financial misstatements where membership in the company's audit committee has been found sufficient to state a claim for control person liability.

Plaintiffs also do not allege that the Outside Directors had control over Galena's day-to-day operations, Galena's management and policies, Galena's investor and public relations, or the articles or SEC filings at issue. Plaintiffs summarily assert that all Defendants "had direct and supervisory involvement in the day-to-day operations of Galena and/or DreamTeam and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same." CAC ¶ 265. This allegation improperly lumps together all Defendants and is insufficient to plead control person liability for the Outside Directors.

In addition, Plaintiffs do not sufficiently allege that Galena or any of its officers or directors exercised control over DreamTeam. Although Ahn, Bernarda, and Galena exercised control over the specific articles published as a result of Galena's relationship with DreamTeam, as previously discussed DreamTeam is not primarily liable for those allegedly false and misleading articles because DreamTeam is not the "maker" of the statements contained in those articles. Instead, Plaintiffs sufficiently allege a primary violation by DreamTeam under scheme liability for DreamTeam's conduct in relation to the alleged promotional scheme. Plaintiffs, however, do not sufficiently allege that Galena or its personnel had control over DreamTeam's day-to-day operations, management, policies, or decisions with respect to the promotional scheme.

### 4. Control by DreamTeam Defendants

Plaintiffs do not sufficiently allege that Meyer or McCarthy had control over Galena. Plaintiffs sufficiently plead that McCarthy, but not Meyer, had control over DreamTeam. Plaintiffs' allegations and documents incorporated by reference support an inference that McCarthy was the day-to-day manager of DreamTeam and managed DreamTeam's involvement in the alleged promotional scheme with Galena.

### 5. Conclusion

Plaintiffs sufficiently allege control person liability against Ahn, Bernarda, and Dunlap for secondary liability with respect to Galena's alleged primary violations. Plaintiffs also sufficiently allege control person liability against McCarthy for secondary liability with respect to DreamTeam's alleged primary violation. Plaintiffs do not sufficiently allege control person liability against Bjorlin, Lidingo, Meyer, Schwartz, or the Outside Directors. The control person claims against these defendants are dismissed.

## F. Claims Three and Four: Insider Trading under Section 20A, 10(b), and Rule 10b-5

Plaintiffs allege insider trading claims against Defendants Ahn, Kriegsman, Chin, Nisi, Hillsberg, Galliker, and Schwartz in violation of Section 20A, Section 10(b), and Rule 10b-5. Section 20A of the Exchange Act states, in relevant part:

> Any person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class.

15 U.S.C. § 78t–1(a). To allege a violation of Section 20A, a plaintiff must allege an underlying

"insider trading" violation of Section 10(b) or Rule 10b-5. *Lipton v. Pathogenesis Corp.*, 284

F.3d 1027, 1035 n.15 (9th Cir. 2002).

Plaintiffs here allege a "traditional" or "classical" insider trading violation of

Section 10(b) and Rule 10b-5. "'Under the 'traditional' or 'classical theory' of insider trading

liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of

his corporation on the basis of material, nonpublic information.'" *S.E.C. v. Talbot*, 530

F.3d 1085, 1090-91 (9th Cir. 2008) (quoting *U.S. v. O'Hagan*, 521 U.S. 642, 651–52 (1997)).

This type of trading qualifies as a "deceptive device" under Section 10(b) because "'a

relationship of trust and confidence [exists] between the shareholders of a corporation and those

insiders who have obtained confidential information by reason of their position with that

corporation.'" *O'Hagan*, 521 U.S. at 652 (quoting *Chiarella v. United States*, 445 U.S. 222, 228

(1980)); *see also* Rule 10b5-1(a), *codified at* 17 C.F.R. § 240.10b5–1(a) ("The 'manipulative and

deceptive devices' prohibited by Section 10(b) of the Exchange Act (15 U.S.C. 78j) and

§ 240.10b-5 thereunder include, among other things, the purchase or sale of a security of any

issuer, on the basis of material nonpublic information about that security or issuer, in breach of a

duty of trust or confidence that is owed directly, indirectly, or derivatively, to the issuer of that

security or the shareholders of that issuer, or to any other person who is the source of the

material nonpublic information.").

"[A] purchase or sale of a security of an issuer is 'on the basis of' material nonpublic

information about that security or issuer if the person making the purchase or sale was aware of

the material nonpublic information when the person made the purchase or sale." Rule 10b5-1(b).

Whether a transaction is "on the basis" of material nonpublic information is subject to the

affirmative defenses that the sales were pursuant to a binding contract or stock sale plan specifying the amount, price, and date of the securities transaction, or a specific algorithm or formula for determining securities transactions, that was entered into before the insider knew about the material nonpublic information. Rule 10b5-1(c).

Additionally, scienter "is a necessary element of an insider trading violation" and is defined as "'a mental state embracing intent to deceive, manipulate, or defraud.'" *U.S. v. Smith*, 155 F.3d 1051, 1068 (9th Cir. 1998) (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1568 (9th Cir. 1990)). The PSLRA's heightened pleading standards for scienter also apply to insider trading claims. *Spot Runner*, 655 F.3d at 1056. As with other claims under Section 10(b), scienter can be inferred by suspicious and unusual stock sales. *See Am. West*, 320 F.3d at 937-38. Whether multiple insiders sell their stock around the same time period is circumstantial evidence of scienter. *Cf. Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) (noting that the inference of scienter is weak when only one insider takes advantage of the alleged inside information and the other insiders act in a way inconsistent with the inference).

Finally, the Ninth Circuit has held that "the scope of liability for insider trading claims under section 10(b) and Rule 10b-5 is confined to persons who traded contemporaneously with the insider" and contemporaneous trading must be pled with particularity. *Neubronner v. Milken*, 6 F.3d 666, 670 (9th Cir. 1993). The Ninth Circuit has not, however, delineated the time frame that constitutes "contemporaneous" trading, and district courts within the Ninth Circuit require trades ranging from one day to up to eight days. *See, e.g, Johnson v. Aljian*, 257 F.R.D. 587, 593-95 (C.D. Cal. 2009) (four days); *In re Countrywide Fin. Corp. Litig.*, 588 F. Supp. 2d 1132, 1205 (C.D. Cal. 2008) (one day); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527

F. Supp. 2d 1164, 1195-96 (C.D.Cal. 2007) (eight days); *In re Petco Animal Supplies Inc. Sec. Litig.*, 2006 WL 6829623, at *37 (S.D. Cal. Aug. 1, 2006) (eight days).

Thus, to sufficiently allege insider trading in violation of Section 10(b) and Rule 10b-5, Plaintiffs must allege that the Selling Defendants: (1) were Galena insiders[43]; (2) were aware of material and nonpublic information at the time the Selling Defendants sold their Galena stock; (3) had the requisite scienter; and (4) traded contemporaneously with Plaintiffs.[44] Plaintiffs allege that the Selling Defendants sold significant percentages of their personally-held Galena stock, all within the span of 18 trading days, while in possession of the material, nonpublic information of the alleged promotional scheme and Galena's preliminary earnings report.

### 1.   Insider trading based on the alleged promotional scheme and misrepresentations

The Selling Defendants argue that Plaintiffs do not properly plead the Selling Defendants' scienter and that the sales were "on the basis of" material nonpublic information. As discussed above, the Court has found that Plaintiffs adequately plead scienter for all the Selling Defendants except Schwartz.

Whether Plaintiffs adequately allege that the sales were "on the basis of" material nonpublic information turns on whether Plaintiffs adequately allege that the Selling Defendants were "aware of the material nonpublic information when [they] made the purchase or sale." Rule 10b5-1(b). This is closely tied with scienter. The Court finds that the Consolidated Complaint adequately alleges that all the Selling Defendants, with the exception of Schwartz,

---

[43] The parties do not dispute that the Selling Defendants were Galena insiders.

[44] Defendants do not dispute that at least one Plaintiff traded contemporaneously with the alleged inside sellers. Defendant Schwartz had challenged contemporaneousness in his motion but had inadvertently overlooked Plaintiff Cho's purchase of sales made on the same day that Defendant Schwartz sold his shares. Defendant Schwartz withdrew his contemporaneousness challenge at oral argument.

were aware of the alleged promotional scheme and Galena's artificially inflated stock price at the time they sold their personally-held Galena stock. Thus, Plaintiffs' adequately allege that the sales were "on the basis" of the material nonpublic information.

### 2.  Insider trading based on the 2013 preliminary earnings report

Plaintiffs also allege that the Selling Defendants sold while in possession of the material, nonpublic information of Galena's preliminary 2013 earnings report. Galena's insider trading policy expressly stated that annual and quarterly earnings reports were ordinarily considered material information. On December 2, 2013, Dunlap sent an email to certain Galena insiders, including Ahn and Schwartz, informing them that Galena insiders were in a trading blackout period and could not trade Galena stock until the 2013 earnings report was released, which would likely be on March 13, 2014. On December 11, 2013, Dunlap sent an email to Ahn informing him that the blackout period would likely extend to mid-May 2014, because the 2013 year-end earnings and the 2014 first quarter earnings were compressed and insiders would remain in a trading blackout period until both earnings reports were released. On January 3, 2014, Dunlap sent an all-company email informing the recipients that Galena was in a blackout period and its stock could not be traded until after the earnings report was released, which would likely be on March 19, 2014.

Defendants argue that Plaintiffs' allegations fail to state a claim for insider trading based on the earnings report because Plaintiffs do not allege facts showing that the preliminary earnings report was material. Defendants argue that Plaintiffs pleaded no facts showing that the report contained unfavorable earnings information that was not already available to investors, such as that when the earnings were publicly announced they were unfavorable in some way that the market did not expect and Galena's stock price declined.

Similarly, the Outside Directors argue that Plaintiffs fail adequately to allege insider trading on the basis of the preliminary earnings report because Plaintiffs do not allege facts showing that the preliminary information was below market expectations. The Outside Directors rely on *In re McKesson HBOC, Inc. Secs. Litig.*, 126 F. Supp. 2d 1248, 1260 (N.D. Cal. 2000).[45] *McKesson* found that where the nonpublic information, though important, was information that if disclosed likely "would only redouble the plaintiffs' resolve to enter in to the proposed transaction," then the information was immaterial for purposes of an insider trading claim. *Id.* at 1260-61.

Plaintiffs did not respond to these arguments. Plaintiffs summarily state in their response brief only that "Defendants also traded on the 2013 preliminary earnings, which were provided one day before the Selling Defendants starting dumping their shares for massive profits."

Defendants' arguments are well taken. Plaintiffs do not allege facts that show the materiality of the preliminary 2013 earnings report. Plaintiffs do not, for example, allege what the earnings report disclosed when it was released in March or how the market responded to that earnings report. Plaintiffs' reliance on Galena's insider trading policy is insufficient. Plaintiffs incorporate the policy by reference, and it states that earnings reports are "ordinarily" material. But that is insufficient to show that the particular earnings report provided to the Selling Defendants on January 16, 2014 was material. Defendants' motion to dismiss is granted with respect to Plaintiffs' claims of insider trading based on the 2013 preliminary earnings report.

---

[45] The Outside Directors also rely on *Shurkin v. Golden State Vintners Inc.*, 471 F. Supp. 2d 998, 1025-26 (N.D. Cal. 2006), for the proposition that an insider trading claim must specify what material nonpublic information the insider is alleged to possess. That is a correct statement of law, but here Plaintiffs do specify what material nonpublic information the Selling Defendants are alleged to have possessed—the 2013 preliminary earnings report.

PAGE 89 – OPINION AND ORDER

### 3. Conclusion

Plaintiffs adequately allege insider trading claims against all Selling Defendants except Defendant Schwartz, based on the material, nonpublic information of the alleged promotional scheme. Plaintiffs do not adequately allege insider trading claims against Defendant Schwartz because Plaintiffs do not sufficiently Schwartz's scienter. Plaintiffs also do not adequately allege insider trading claims against any Selling Defendant based on Galena's 2013 Preliminary Earnings Report.

## CONCLUSION

The motion to dismiss filed by Defendants Rudolph Nisi, Sanford Hillsberg, Steven Kriegsman, Stephen Galliker, and Richard Chin (Dkt. 80); the motion to dismiss filed by Defendant Mark J. Ahn (Dkt. 81); the motion to dismiss filed by Defendants Mark Schwartz, Ryan Dunlap, Remy Bernarda, and Galena (Dkt. 82); the motion to dismiss filed by Defendants Lidingo and Kamilla Bjorlin (Dkt. 136); and the motion to dismiss filed by Defendants DreamTeam and Michael McCarthy (Dkt. 138) are GRANTED IN PART and DENIED IN PART, as set forth herein. Plaintiffs have leave to file an amended complaint within 28 days from the date of this Opinion and Order.

**IT IS SO ORDERED.**

DATED this 5th day of August, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge